Theodore MITCHELL, Frank Dolan, William Fischer and Arthur Meadows, on Their Behalf and on the Behalf of All Others Similarly Situated, Plaintiffs-Appellees,

v.

Mario CUOMO, Governor of the State of New York, Thomas A. Coughlin, III, Commissioner of the New York State Department of Correctional Services, Raymond R. Bara, Superintendent of the Long Island Correctional Facility, Defendants-Appellants.

No. 494, Docket 84–7813.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1984.

Decided Nov. 26, 1984.

---

[*] The Honorable Jacob Mishler, Senior District Judge, Eastern District of New York, sitting by designation.

Friendly, Circuit Judge, filed dissenting opinion.

Howard L. Zwickel, Asst. Atty. Gen., State of New York, New York City (Robert Abrams, Atty. Gen., Barbara B. Butler, Asst. Atty. Gen., State of New York, New York City, of Counsel), for defendants-appellants.

Leon Friedman, New York City (John H. Steel, New York City, of Counsel), for plaintiffs-appellees.

Before LUMBARD, FRIENDLY, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

In this action by inmates of the Long Island Correctional Facility (LICF), defendants appeal from an order of the United States District Court for the Eastern District of New York, Frank X. Altimari, *Judge*, that granted the inmates' applica-

tion for a preliminary injunction prohibiting defendants from closing LICF pending a trial on the merits. Finding no abuse of discretion, we affirm.

### BACKGROUND

In June of 1982, the New York State correctional system was filled to 114 percent of its permanent housing capacity for prisoners. As part of an ongoing response to the need for additional prison space, the state Department of Correctional Services (DOCS) converted part of the Pilgrim State Psychiatric Center at West Brentwood, Long Island, into the medium-security LICF in July of 1982.

Defending the state's decision to open LICF, Thomas A. Coughlin III, New York's Commissioner of Corrections, described in detail to the state Supreme Court the state's increasingly desperate need for prison beds. He stated that any delay in opening LICF "would be the equivalent of the ingestion of a convulsing thalidomide. In my opinion, the system could not endure it." In September 1983 he stated under oath that "the statewide need for additional housing capacity is grave and immediate; and that any delay in, or deferral of, measures to relieve the State's critically over-extended facilities is an unacceptably dangerous risk." Commissioner Coughlin attributed this "dangerous risk" to overcrowding and testified that among the possible consequences of not providing additional housing space for New York's prisoners were "riots", "death", and "injury to both inmates and [employees] of this department".

However, based on its determination that it had opened LICF without providing adequate opportunity for community participation in the planning process, DOCS decided to close the facility on October 1, 1984. Even though the rest of the state correctional system was filled to 116 percent of permanent capacity as of September 1984 —making the system more overcrowded than when LICF opened—the DOCS plan would have reduced the state's inmate housing capacity by 1000 beds and required

the transfer of approximately 475 LICF inmates into other medium and maximum security prisons in the state.

The inmates brought this action alleging that the plan to close LICF and transfer them to other overcrowded facilities would violate their eighth and fourteenth amendment rights against cruel and unusual punishment. Following a two-day hearing, the district judge preliminarily enjoined defendants from closing the facility and scheduled plaintiffs' underlying claims for trial in January 1985.

The state has appealed, contending that the district judge abused his discretion because the record does not support his findings of irreparable harm, of a sufficiently serious risk to plaintiffs' eighth amendment interests, or of a balance of equities in plaintiffs' favor. The inmates contend that the district judge did not abuse his discretion by maintaining the status quo until trial in January. They argue that irreparable harm is present since closing the prison would be an irreversible act and there is a possible threat to their eighth amendment right not to be subjected to cruel and unusual punishment. They contend, moreover, that the balance of hardships tips decidedly in their favor because their loss would be an unconstitutional deprivation of eighth amendment rights if the injunction did not issue, while the state's gain would be merely financial and administrative.

## DISCUSSION

The standard for granting a preliminary injunction is clear. "A party ... must always show that it is likely to suffer possible irreparable harm if the requested relief is not granted. In addition, it must demonstrate either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Coca Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982). Of course, we must accept the district judge's findings of fact unless they

are clearly erroneous. *Unicon Management Corp. v. Koppers Company*, 366 F.2d 199, 203 (2d Cir.1966). The ultimate, narrow question before us as a reviewing court is whether the district court abused its discretion in issuing the preliminary injunction. *Coca Cola Co.*, 690 F.2d at 315.

1) *Irreparable Harm.*

The district judge found irreparable harm arising from the facts that without injunctive relief, plaintiffs would be transferred into an already overcrowded system and the LICF would be permanently closed. Obviously, the district judge did not determine at this preliminary stage that closing LICF and transferring the prisoners would, in and of itself, constitute irreparable harm. Rather, the irreparable harm he found arose from the possible deprivation of eighth amendment rights that plaintiffs contend will follow from implementation of the plan. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973). *See Ambrose v. Malcolm*, 414 F.Supp. 485, 493 (S.D.N.Y.1976) (eighth amendment); *Lollis v. New York State Department of Social Services*, 322 F.Supp. 473, 483 (S.D.N.Y. 1970) (eighth amendment). Given the evidence of increasing overcrowding in the state system and its potentially dangerous consequences, which constitute the alleged threat to plaintiffs' eighth amendment rights, the district judge's finding of irreparable harm is not clearly erroneous.

2) *Serious and Substantial Questions.*

In determining whether plaintiffs' eighth amendment claims presented sufficiently serious and substantial questions going to the merits to make them a fair ground for litigation, the district judge correctly looked to the "totality of the circumstances caused by the institutionalized overcrowding." *Lareau v. Manson*, 651 F.2d 96, 107 (2d Cir.1981). "When 'the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates

* * *," the court must conclude that the conditions violate the Constitution." *Rhodes v. Chapman*, 452 U.S. 337, 364, 101 S.Ct. 2392, 2408, 69 L.Ed.2d 59 (1981) (Brennan, *J.*, concurring) (quoting *Laaman v. Helgemoe*, 437 F.Supp. 269, 323 (D.N.H. 1977)). Here, the district judge did not find, nor do we suggest, that the DOCS plan to close LICF and transfer its inmates to other facilities would necessarily lead to a violation of the inmates' eighth amendment rights. Nevertheless, the record does support the district judge's finding that plaintiffs' claims in this regard presented serious and substantial questions.

The district judge found that "a substantial number of inmates [were] housed in 'temporary housing' which was never designed to house inmates, and that healthy and/or non-disruptive inmates [were] housed in the infirmaries or medical units * * *." Prison guards and commissioners testified that infirmaries, program rooms, recreation rooms, storage and locker areas, and even a chapel had been converted to inmate housing units. Further, Commissioner Coughlin admitted in a March 1984 affidavit that DOCS then used 3,652 beds classified as temporary housing and stated that "[t]his housing provides insufficient living space and is substandard with regard to showers, toilets, food service, etc." Somewhat similar conditions prompted us to hold in *Lareau v. Manson*, 651 F.2d at 108 that "as regular methods of housing convicted inmates, none of these practices can pass constitutional muster."

Corrections officers testified to, and the district judge found, "ample evidence which points to an increase in the level of tension and the number of fights or incidents of violence caused by the overcrowding and the 'idle time'" of inmates with no assigned work. Commissioner Coughlin stated in a September 1983 affidavit that the extended use of temporary housing capacity was "unacceptable in that it significantly heighten[ed] the possibility of inmate disturbance", and in March 1984 he "attribut[ed] the riot at the Ossining Correctional Facility in January of 1983 directly to the pressures which overcrowding places on the housing and program resources of the system and on the persons who live and work in our facilities." Faced with similar conditions and tensions in *Lareau*, we were "unwilling to wait until these increases [in security problems] mature[d] into one of the tragic eruptions which have occurred in overcrowded institutions elsewhere before acting to condemn the conditions which breed them." *Lareau v. Manson*, 651 F.2d at 108. Since closing LICF could only intensify these problems that Commissioner Coughlin had described as causing "unacceptably dangerous risks" such as "riots" and "death", the district judge did not err in finding that defendants' plan presented serious constitutional issues that required full exploration at a plenary trial.

Defendants argued that even though closing LICF would reduce the system's housing capacity by 1000 beds, an expected increase from new construction of 1900 beds by the end of this year would allow the system to safely absorb the LICF inmates and all other inmates entering the system during that period. In view of conflicting testimony about the expected weekly net inflow of between 50 and 100 inmates and some doubt as to when the expected new facilities would actually open, the district judge stated that it would not "risk the potential violation of plaintiffs' Eighth Amendment rights based upon a hope for what will be in the future", and properly found that defendants had not demonstrated to the court's satisfaction that sufficient new spaces were presently operational to eliminate the risk of constitutional harm.

3) *Balance of Hardships.*

Finally, the district judge found that "the balance of hardships tips decidedly in plaintiffs' favor". Although "troubled by defendants' assertion that any delay in the closing of LICF would cause fiscal chaos as well as additional strain on the DOCS' security force," the district judge concluded that in light of the serious and substantial questions going to the merits of the eighth amendment claim, "the plaintiffs would

face significantly greater hardship if transferred elsewhere in the DOCS system as presently constituted." Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding that the district judge did not err in finding that the balance of hardships tips decidedly in plaintiffs' favor. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983), *denying partial stay pending appeal in* 572 F.Supp. 26 (C.D.Cal.), *partial stay granted pending appeal*, 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (Rehnquist, Circuit Justice), *emergency application to vacate stay denied,* —— U.S. ——, 104 S.Ct. 221, 78 L.Ed.2d 217, *district court aff'd in part and rev'd in part,* 725 F.2d 1489 (9th Cir. 1984).

### CONCLUSION

In short, defendants have not overcome "the heavy burden of establishing that the trial court misapplied [the] accepted principles" for issuing a preliminary injunction. *Guinness & Sons v. Sterling Publishing Company*, 732 F.2d 1095, 1099 (2d Cir. 1984). We recognize that for this case, as for many others in the prison context, final determination after the January trial may involve difficult legal and factual questions. The purpose of the preliminary injunction now before us, however, is not to decide such questions but "to preserve the status quo pending final determination of a dispute." *Id.* We expect that, because the preliminary injunction restricts to a limited degree the flexibility the state has in operating its prison system, the district court will conduct the pretrial and trial proceedings and render a decision with due dispatch, consistent, of course, with the needs of the parties for necessary preparation and prosecution of their cases. Of course, should the underlying circumstances change significantly between now and conclusion of the trial the preliminary injunction can be modified or vacated by the district court on proper application. In view of the tragic consequences of past disturbances in New York's prison system and the likely relationship between these disturbances and overcrowding, we cannot find an abuse of discretion in the district judge's hesitation to permit still greater overcrowding of the correctional system under the particular circumstances of this case. This panel retains jurisdiction of the case for purposes of any future appeals.

The preliminary injunction is affirmed.

FRIENDLY, *Circuit Judge*, dissenting:

So far as I am aware, this is the first case in which a federal court has used the powerful weapon of an injunction against state prison administrators when no violation of prisoners' Eighth Amendment rights has occurred and the court simply is fearful that one might. If a preliminary injunction is to issue in such a case, the factual showing must be very strong, whereas here, as will subsequently be shown, it was exceedingly weak, at least with respect to two-thirds of the transfers proposed. Issuance of an injunction here flies in the face of the Supreme Court's many admonitions in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), that federal judges should avoid intruding into state prison administration unless clear-cut violations of the Eighth Amendment demonstrated. *Id.* at 348, 349–50, 351–52, 101 S.Ct. at 2400, 2400–01, 2401–02. There is no need to quote all these warnings; I will here limit myself to the concluding one that federal "courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system ...." *Id.* at 352, 101 S.Ct. at 2402. We should look for guidance to the majority opinion in *Rhodes*, representing the views of six justices, rather than, as the majority here does, to the concurring opinion, which represents the views of only three, or to our own opinion in *Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981), portion of which relied on the lower court decision in *Chapman v.*

*Rhodes,* 434 F.Supp. 1007 (S.D.Ohio 1977), *aff'd mem.,* 624 F.2d 1099 (6th Cir.1980), that was reversed by the Supreme Court only a fortnight after *Lareau* was decided.

The State's plan enjoined by the district court concerned approximately 450 prisoners remaining at LICF.[1] One hundred and fifty of these prisoners were to be placed in eleven medium security facilities located in the lower Hudson region; DOCS anticipated that the needed space would become available there as the result of ordinary attrition. Another hundred and fifty LICF prisoners would be offered the option of transferring to the Sing Sing correctional facility; the thought was that many prisoners would prefer to spend their last months of incarceration in a facility near New York City and thus closer to home, rather than be transferred upstate. Although Sing Sing is a maximum security prison, transferees would retain medium security classification and preference would be given to those with the shortest time remaining on their sentences. The necessary beds would become available through the movement of Sing Sing inmates to maximum security facilities upstate where space would become available as medium security prisoners housed in maximum security prisons were moved into newly constructed medium security prisons. The remaining one hundred and fifty prisoners (plus any who did not exercise the Sing Sing option) would be transferred to Greene, a new facility which was expected to be able to house 500 inmates by the end of October 1984, very nearly the same date as that anticipated for the completion of the transfer of the LIFC prisoners. From what we were told at argument on October 24, 1984, the district judge's doubts about the early availability of Greene proved unfounded. In any event, as his opinion acknowledges, the Groveland Correctional Facility, the availability of which was not relied upon in devising the plan to close LICF, was "scheduled to become fully operational at a capacity of four-hundred over a five week period which began on or about September 17, 1984 ...;" this space was also available "if necessary" to complete the closing of LICF, Testimony of Director Clark, Joint App. at 285. We were told at argument that Groveland already had 125 prisoners and could take 50 more per week up to a maximum of 360 during 1984. State officials testified further that an additional 1000 beds would be added with the opening of the new Wyoming and Orleans facilities by December 31, 1984; that by January, 1985, another hundred beds would be added at Groveland; that by March, 1985 an additional five hundred beds would come on-line with the completion of another new facility at Great Meadow; and that a further one thousand new beds would become available in March and April, 1985. Quite obviously these extensive new facilities will have the bed capacity to handle the 450 transferred prisoners—even if that number were not further reduced by attrition. Moreover, the district judge conceded that Deputy Commissioner Leonardo had testified that "he would never allow the movement of inmates to a new facility where their reasonable food, sanitation, medical and/or safety needs would not be met." The State's plan was not written in stone, as the judge seemed to assume, and it is plain that LICF prisoners would not be transferred to new facilities until these were ready. Indeed, Deputy Commissioner Leonardo testified specifically that if the new facilities upon which the plan to close LICF depended were not available, he would not proceed with the plan because neither he nor the Commissioner would "put inmates or staff in an unsafe situation."

It is hard for me to understand, in the light of this largely uncontradicted evidence, how the district judge could have found a likely violation of the Eighth Amendment rights of the LICF prisoners, except possibly with respect to the one hundred and fifty whom DOCS proposed to transfer to the lower Hudson prisons. As to these facilities, there was some evidence of serious overcrowding and other problems, although I do not believe that any of

---

**1.** This figure compares with a total state prison population of 32,988 in September 1984.

this evidence demonstrated a condition sufficiently serious to constitute an Eighth Amendment violation. *See Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400. There is no possibility of an Eighth Amendment violation with respect to Sing Sing; if a prisoner did not want to go there, he could simply decline. Neither was there any real doubt that the new facilities could handle the remainder of the LICF transferees. Indeed, with the exception noted in respect of the lower Hudson prisons, the judge does not seem to have found any likelihood that the Eighth Amendment rights of the LICF prisoners would be violated by what the State proposed; the injunction was based rather on the fear that the transfer of LICF prisoners to the new facilities would delay access to these facilities by the excess of new prisoners (including "state readies," i.e., defendants who had been held in county jails pending conviction and sentence) over prisoners discharged for having served their sentences or by being placed on parole. However, the LICF prisoners are not entitled to assert prospective violation of the constitutional rights of others. There was no sufficient evidence that any such delay would result in a violation of the constitutional rights of these prisoners; if there turned out to be violations, the rights should be asserted by the victims, not by the LICF transferees. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Weaver v. Wilcox,* 650 F.2d 22, 27 (3d Cir.1981) ("an inmate does not have standing to sue on behalf of his fellow prisoners"); *United States ex rel. Ratchford v. Mazurkiewicz,* 451 F.Supp. 671, 673 (E.D.Pa.1978) (prisoner cannot sue to vindicate another prisoner's due process rights); *Fowler v. Graham,* 478 F.Supp. 90, 93 & n. 10 (D.S.C. 1979).

To put the matter in another way, despite the district court's disclaimer that it "need not and does not make a determination as to the constitutionality of the entire New York State penal system," it seems to have done precisely that. The basis for its result was its conclusion that because the New York penal system is overcrowded in its entirety, transfer of even as few as 450 LICF prisoners, less than 1.5% of the total prison population, would require prison officials to place in jeopardy the Eighth Amendment rights of an equivalent number of other prisoners somewhere in the system. This conclusion not only hinges on the speculative Eighth Amendment claims of unidentified and unidentifiable prisoners not before the court, but also necessarily assumes that the mere fact of overcrowding constitutes an Eighth Amendment violation because it tends to increase tension and decrease care. Yet the majority in *Rhodes* held that 38% overcrowding—much worse than the evidence showed to be the situation in New York prisons or county jails—fell "far short ... of proving cruel and unusual punishment." 452 U.S. at 348, 101 S.Ct. at 2400. To sustain an Eighth Amendment claim, prisoners must show not merely that they will be placed in overcrowded facilities, but also demonstrate specific manifestations caused in the particular institution as a result of the overcrowding that "inflict unnecessary or wanton pain." *Id.* Issuance of the temporary injunction was thus founded on a doubly erroneous theory of law, and is not protected by the "abuse of discretion" standard of review. *See Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1358 (2d Cir.1976); *Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 315–16 (2d Cir. 1982); *Sierra Club v. Hennessy,* 695 F.2d 643, 647 (2d Cir.1982); 11 Wright & Miller, Federal Practice and Procedure § 2962 at 636–38 (1973) (citing cases).

Beyond this, I believe that a test more rigorous than the "serious question/balance of hardships" branch of this court's standard formulation with respect to the grant of a preliminary injunction, which we have regularly employed in private litigation since *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 (2d Cir.1953), should be applied when an injunction is sought against a sovereign. Judge Van Graafeiland wrote to this effect for unanimous panels in *Medical Soc'y of State of New York v. Toia,* 560 F.2d 535, 538 (2d

Cir.1977), where state action was involved, and in *Union Carbide Agricultural Prods. Co. v. Costle*, 632 F.2d 1014, 1017–18 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981), where federal action was at issue.[2] These decisions are sound law. It is inconsistent with principles of federalism for a district judge to stop a sovereign state "in its tracks," *Union Carbide, supra*, 632 F.2d at 1018, unless the plaintiff shows, in addition to irreparable harm, a likelihood of success. For the reasons indicated above, I do not believe that plaintiffs have made a showing on this score anywhere nearly sufficient to justify an injunction of the breadth of the one issued here;[3] an injunction limited to transfers to the lower Hudson prisons would have been another matter.

Appellees place great stress on the fact that the injunction will last only until the trial in January, 1985. However, as I see the case, the plaintiffs cannot prevail without having the court review the constitutionality of the entire New York prison system (including county jails). This will require prognostications of the number of incoming and outgoing prisoners and the advent of new facilities while the 450 LICF prisoners are being absorbed, and also will necessitate joining representatives of other classes of prisoners as plaintiffs. Moreover, the majority recognizes that "final determination after the January trial may involve difficult legal and factual questions." After the trial there will be the need for briefs and proposed findings, and the district court will require time to prepare its opinion. I do not see an end to this litigation even in the district court until well into the spring of 1985, after which another appeal is almost certain.

Underlying the opinions both of the district court and of the majority in this court seems to be the view that it was bad policy for the State, faced with a chronic shortage of beds, to deprive itself of 1000 entirely suitable prison beds at LICF, the need for which it had stoutly maintained in earlier litigation. There also seems to be a belief that the asserted reason for closing LICF—the alleged inadequate "opportunity for community participation in the planning process" for conversion of a part of the former Pilgrim State Psychiatric Center into a prison, afforded by the previous State administration—was an insufficient justification for such drastic action as closing LICF, as distinguished from affording now the opportunity for comment thought to have been withheld then. All this may well be so but, as the Supreme Court said in *Rhodes v. Chapman:*

> In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell v. Wolfish,* 441 U.S. 520 at 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

452 U.S. at 351, 101 S.Ct. at 2401 (footnote omitted).

I respectfully dissent.

---

2. Appellees cite in opposition *Sadowsky v. City of New York*, 732 F.2d 312, 316 (2d Cir.1984), where the court repeated the traditional language in an action for an injunction against a city. This court there approved the action of the district court in *denying* an injunction, and the discussion in the opinion shows that nothing turned on the appropriate standard. *Id.* at 316–18. Language in *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980), is more helpful to appellees, but the court there found that "the merits of this case provide more than a 'fair ground for litigation.'"

3. The court's order preliminarily enjoined the State from closing the LICF, from transferring inmates out of LICF for the purpose of implementing the plan to close the facility (with a minor exception not here material) and from terminating the employment of or involuntarily transferring employees of DOCS currently employed at LICF for the purpose of implementing the plan to close the facility. The judge could have met any proper concerns simply by prohibiting transfers to the overcrowded lower Hudson facilities.