**SOUTH LYME PROPERTY OWNERS ASSOCIATION, INC., Charles and Victoria Parsons and Joan Byer, Plaintiffs,**

v.

**TOWN OF OLD LYME, Town of Old Lyme Zoning Commission, Eric Fries, George James, Jane Marsh, Thomas Risom, Walter Seifert, Sharon Colvin and Marilyn Ozols, Defendants.**

No. 3:00CV97 (EBB).

United States District Court, D. Connecticut.

Oct. 10, 2000.

Kenneth R. Slater, Jr., Eisenberg, Anderson, Michalik & Lynch, New Britain, CT, for Plaintiffs.

Thomas R. Gerarde, David S. Monastersky, Howd & Ludorf, Hartford, CT, Mark K. Branse, Glastonbury, CT, for Defendants.

*Ruling on Plaintiffs' Motion for Preliminary Injunction*

BURNS, Senior District Judge.

Plaintiffs, an association of property owners in Old Lyme, Connecticut and two individually named Old Lyme property owners, seek to enjoin the Town of Old Lyme, the Town of Old Lyme Zoning Commission, its members, and its Zoning Enforcement Officer from implementing certain amendments, adopted in 1995, to the Old Lyme Zoning Regulations [hereinafter "the 1995 Regulations"]. For the reasons set forth below, the Court GRANTS Plaintiffs' motion for preliminary injunction.

## I. BACKGROUND

### A. *Procedural History*

Plaintiffs commenced this action in Connecticut Superior Court in the Judicial District of New London, claiming that the adoption and enforcement of the 1995 Regulations regarding seasonal and year-round use of property violate Connecticut General Statutes § 8–2, Article I, §§ 8, 10 and 20 of the Connecticut Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. The action included a request for a preliminary injunction seeking to enjoin the systematic designation of properties as "seasonal" under the 1995 Regulations. [doc. # 5] On January 19, 2000, Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1441, 1443, and 1446, invoking jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). [doc. # 1].

A three-day hearing on Plaintiffs' motion for preliminary injunction was held on April 12–14, 2000. During that hearing, Plaintiffs limited the scope of their request for a preliminary injunction to their procedural due process claim. Plaintiffs concede for the purposes of this motion only that the 1995 Regulations were validly adopted for a lawful public purpose and are rationally related to public health, safety, and welfare. (Transcript of 4/13/00 at 3–10 [hereinafter "Tr. (4/13)"].) The narrow issue for this motion, therefore, is whether the procedures employed to implement the 1995 Regulations violate the

fundamental requirements of due process of law. (*Id.* at 5–10.) On this ground alone, Plaintiffs seek temporary relief from the systematic seasonal-use-only determinations currently being made on an alphabetical street-by-street basis.

## B. *Statement of Facts*

The Court finds the following facts based on a review of the record at the hearing on plaintiffs' motion for injunctive relief.

The South Lyme Property Owners Association, Inc. [hereinafter "the Association"] is a non-stock corporation located in Old Lyme, Connecticut. (Pls.' Ex. 1.) Its members are comprised of property owners in Old Lyme, and the organization was formed for the purpose of invalidating the 1995 Regulations challenged in this lawsuit. (Pls.' Exs. 2, 3.) Charles and Victoria Parsons are the owners of 11 Brookside Avenue, Old Lyme, Connecticut and are members of the Association. Joan Byer is the owner of 61 Breen Avenue, Old Lyme, Connecticut and is also a member of the Association. (Compl. at ¶¶ 8–9.)

The defendant Town of Old Lyme [hereinafter "the Town"] is a Connecticut municipal corporation. The Defendant Old Lyme Zoning Commission [hereinafter "the Commission"] is the municipal agency designated by the Town to administer the Zoning Regulations of the Town. (Compl. at ¶¶ 2–3.)

The Defendants Eric Fries, George James, Jane Marsh, Thomas Risom, Walter Seifert, and Sharon Colvin, at all times relevant to this action, are or were members of the Commission. Defendant Marilyn Ozols is the Zoning Enforcement Officer (ZEO) of the Town and is empowered to enforce the zoning regulations adopted by the Commission. (Compl. at ¶¶ 4–5.) Each of these defendants is sued in his or her official capacity

The properties at issue in this case are located in the "R–10" zoning district. R–10 stands for a residential classification on a lot of 10,000 square feet. (Transcript of 4/12/00 at 26–27 [hereinafter "Tr. (4/12)".].) Conforming parcels in the R–10 zone have a minimum of 10,000 square feet. Therefore, any lot in the R–10 zone containing less than 10,000 square feet is considered non-conforming. A nonconforming lot, use, or structure is one that is prohibited by a zoning regulation or amendment but which existed lawfully on the date the regulation prohibiting the lot, use, or structure became effective, and, therefore, may lawfully be continued. *See* Tondro, *Connecticut Land Use Regulation* 149–50 (2d Ed.1992); Conn.Gen.Stat. § 8–2(a); (J. Ex. 1, Attach.B, Art. I, § 8.1.1).

Prior to 1992, Article II, § A.1 of the Old Lyme Zoning Regulations [hereinafter "Pre–1992 Regulations"], (J. Ex. 1, Attach.A), listed the permitted uses for all residential districts, including R–10 zones, and listed single family dwellings as a permitted use. *See* Pre1992 Regulations Art. I, § A.1.1; *see also* (Tr. (4/12) at 27–29). No provision in § A.1 appears to have restricted the use of an R–10 single-family dwelling to a particular time of year or season. The definitions section of the Pre–1992 Regulations defined a "seasonal dwelling" as "a dwelling unit, designed, used or intended to be used for seasonal use," Pre–1992 Regulations Art. I, § C.57, and defined "seasonal use" as "the use of a structure for dwelling purposes between April 1, and November 15, only." *Id.* Art. I, § C.58. Article I, § E.1, regulating non-conforming buildings and uses, prohibited the extension or expansion of any non-conforming use, *see id.* § E.1.3, and prohibited the extension or expansion of any building on a non-conforming lot. *See id.* § E.1.7. Section E, however, did not define "non-conforming uses," nor did it designate seasonal or year-round uses non-conforming in any given zone.[1]

---

1. Three Connecticut Superior Court cases interpret these Pre–1992 Regulations in zoning

enforcement actions brought against property owners to prevent the use of residential dwell-

In 1992, the Commission passed zoning regulations [hereinafter 1992 Regulations], (J. Ex. 1, Attach.B), amending its non-conformity section under Article I to provide:

> 8.7 *Nonconformity—Use:* The following provisions and limitations shall apply to a nonconforming use, building or other structure:
>
> 8.7.1 *Enlargement:* No nonconforming use of land shall be enlarged, extended or altered, and no building or other structure or part thereof devoted to a nonconforming use shall be enlarged, extended, reconstructed or structurally altered, except where the result of such changes is to reduce or eliminate the nonconformity. This prohibition specifically includes the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.

1992 Regulations Art. I, § 8.7.1. With respect to nonconforming lots, the Commission passed a similar regulation, providing:

> 8.8 *Nonconformity—Improvements:* The following provisions and limitations shall apply to nonconforming buildings and other structures and site development:

> 8.8.1 *Enlargement:* ... No building or other structure located on a lot which does not conform to the requirements of these Regulations regarding lot area, shape and frontage, building bulk and coverage or off-street parking shall be enlarged or extended. These prohibitions specifically include the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.

*Id.* § 8.8.1.[2] The 1992 Regulations continued to define "seasonal dwelling" and "seasonal use" in the definitions section, but again do not cross-reference any particular zones or districts. *See* 1992 Regulations Art. I, § 9.3. Article II, § 21.1, Schedule A–1 listed the permitted uses in residence and rural districts, and continued to include single-family dwellings as a permitted use of property. *See id.* Art. II, § 21.1, A–1. No provision in Schedule A–1 placed any time-of-year or seasonal restriction on the use of property in residential districts.[3]

In 1995, the Commission adopted amendments to the 1992 Regulations [hereinafter the "1995 Regulations"], (J. Ex. 1, Attach C), regarding the permitted use of property in residential districts.[4]

---

ings between November 15 and April 1. In each case, in the context of determining whether the year-round use of a seasonal property constituted an extension or expansion of a pre-existing non-conforming use, the court found that there were no prohibitions in the zoning regulations against the year-round use of seasonal dwellings because although the regulations include definitions of seasonal use, they do so without restricting that use. *See Arcata v. Zoning Board of Appeals,* 1993 WL 394500, at *6 (Conn.Super.Ct. Sept.21, 1993); *Habicht v. Zoning Board of Appeals,* 1993 WL 284791, at *7 (Conn.Super.Ct. July 22, 1993); *French v. Zoning Board of Appeals,* 1993 WL 284789, at *7 (Conn.Super.Ct. July 22, 1993).

2. Jane Marsh, a Commission Member, testified that the adoption of the 1992 Regulations restricted the conversion of seasonal properties to year-round properties on non-conform-

ing lots, and as such, were consistent with Old Lyme's 1990 Town Plan of Development identifying the capacity of on-site sewage systems in the beach area as a critical issue, and recommending a prohibition against the expansion and winterization of seasonal dwellings unless relevant health and building codes are met. (Tr. (4/12) at 90; Defs.' Ex. I at 3–4, 12.) The Connecticut Department of Environmental Protection endorsed this plan with respect to controlling the expansion and winterization of seasonal dwellings in beach areas. (Tr. (4/12) 87–88; Defs.' Ex. H at 3.)

3. Neither Ms. Marsh, nor the ZEO, could identify provisions limiting the permitted use of residential property to certain months of the year. (Tr. (4/12) at 54–55; Tr. 4/13 at 124.)

4. The regulations were adopted in response to the Commission's continued concern for overuse of wells and failing septic systems, (Tr.

Most significantly, the Commission amended the schedule of permitted uses in residential zones to provide that year-round use of single-family dwellings is permitted "subject to the additional standards of Par. 21.2." 1995 Regulations Art. II, § 21.1. The relevant provisions under § 21.2 address the conversion of a seasonal use dwelling to a year-round use dwelling, *see id.* § 21.2.5; they do not prohibit all year-round use of property in the R–10 zone, or designate seasonal use as the only permitted use in the R–10 zone.[5] Section 21.2.5 of the 1995 Regulations provides:

> 21.2.5 *Conversion of Seasonal Use Dwellings to Year-round Use* (June 5, 1995)
>
> a. No dwelling located in the Town of Old Lyme which on the effective date hereof is a seasonal use dwelling shall be converted to a year-round use dwelling unless an application for such conversion has been approved by the Zoning Enforcement Officer ... under the application requirements and standards set forth in subparagraph c. hereof.
>
> b. For the purpose of administration of this section, the Zoning Enforcement Officer ... may designate from time to time those properties on which there has been an affirmative determination that there is located thereon a seasonal use dwelling.... The absence of such designation shall merely mean no determination has been made by the Zoning Enforcement Officer of the Town of Old Lyme, and shall not be deemed to be evidence that a dwelling is a year-round use dwelling.
>
> Nothing in this Regulation shall be deemed to preclude a landowner from contesting such designation by demonstrating to the Zoning Enforcement Officer that the designated seasonal use dwelling was a lawfully pre-existing nonconforming use, or prior to January 1, 1992 was a lawfully existing single detached dwelling for one family, located on a lot with not more than one such dwelling, and that such dwelling was continuously maintained as a year-round use dwelling thereafter....

Paragraph "C" then describes the standards for converting to year-round use, and, among other things, requires that the lot contain a minimum of 10,000 square feet, that there be no more than one dwelling unit on the lot, and that year-round water supply and on-site septic systems comply with applicable Connecticut Health Department standards. *See* 1995 Regulations Art. II, § 21.2.5(c).

These provisions essentially establish a permit system for conversion from seasonal to year-round use. Any property designated for seasonal use is subject to the permit system for conversion. In order to implement the permit system for conver-

(4/12) at 57–58, 64, 101–02; Defs. Ex. K at 43), and to the additional concern of ground water pollution and its impact on Long Island Sound. (Tr. (4/12) at 95–99; Defs.' Ex. J.) Dennis Grecci, a supervising engineer with the Connecticut Department of Environmental Protection, and Brian Curtis, an environmental engineer specialist in Connecticut and New York, testified about the risk of nitrogen pollution when houses on lots of 10,000 square feet or less are used year-round. Mr. Grecci testified that the over-use of too many septic tanks located too close together prevents the proper renovation of water. (Transcript of 4/12/00 at 6–8 [hereinafter "Tr. (4/14)].)" When not enough land area exists above a septic system, not enough rainfall is able to reach the groundwater to dilute the nitrates in the septic systems. Mr. Curtis testified that septic systems generally remove 30–40% of nitrogen from the water, but the remainder of the dilution process is dependent upon infiltrating rainfall. (*Id.* at 38.) Non-diluted nitrates cause hypoxia, a condition that starves the water of oxygen. This pollution affects both Long Island Sound and the Town drinking water. High levels of nitrogen pollution in drinking water can cause stress and death among infants. (*Id.* at 39.)

5. Ms. Marsh testified that the Commission at one point had considered making seasonal use the only permitted use in R–10 zones, but decided that such a regulation was too restrictive, and instead should allow for conversion to year-round use if the property could support a proper septic system. (Tr. (4/12) at 78–80.)

sion, however, the Town must first establish which existing properties are seasonal use and which are year-round use. Section 21.2.5(b) enables the ZEO to issue these seasonal determinations. Finally, § 21.2.5(b) enables a property owner to challenge a seasonal use designation by demonstrating year-round use prior to 1992.[6]

Pursuant to this provision, the ZEO implemented a procedure to evaluate the status of existing properties on a systematic street-by-street basis in alphabetical order. The ZEO testified that the purpose of the evaluation is to determine current use of the property, but that related to determining current use is the issue of whether there was a valid non-conforming year-round use of the property existing prior to 1992 that the owner is entitled to maintain. (Tr. (4/13) at 47.) To that end, both the ZEO and Ms. Marsh acknowledged that the determination depended on whether the property was actually used during the winter months prior to 1992. (Tr. (4/12) at 85, 157–58.)

The ZEO begins the systematic process by making a preliminary determination of seasonal versus year-round use based on a review of the property's zoning file and other available town records. (Tr. (4/12) at 150–54.) These records include assessor's cards, health department determinations, and possibly building permit applications. (Id.) The preliminary procedure, however, does not include an interview of the property owner as to whether the property was actually used on a year-round basis prior to 1992. (Id. at 152.)

The assessor's records reviewed by the ZEO are "street cards" generated by the Town Assessor, Walter E. Kent. The information collected on the street card is information necessary to evaluate the property for tax purposes. (Pls.' Exs. 7–11.) Typical information includes property location,

dimensions, utilities, and improvements. Absent a permit application to improve the property, the property is assessed once every ten years. (Tr. (4/12) at 113–15.) Under Mr. Kent's tenure, property in Old Lyme was evaluated in 1980, in 1990, and is currently undergoing its third re-evaluation.

Assessors employed by Mr. Kent were sent into the field to measure properties and talk to property owners when possible. Some of the cards indicate seasonal use of property in the "notes" section of the card. (Pls.' Exs. 8 & 10.) Mr. Kent testified that the use of the property has no bearing on the value of the property, but is recorded as background information. (Tr. (4/12) at 122.) The seasonal use indication was recorded on the card if the assessor was able to speak to the owner during the inspection; it was not based on inspections performed during winter months to determine whether the property was actually being used off-season. Although efforts were made to access each property for inspection, the assessors were not able to access every property for the 1990 inspection, therefore, some street cards contain information only as recent as 1980. (Id. at (115.) Finally, for the latest re-evaluation, Mr. Kent did not require the assessors to inquire about the use of property. (Tr. (4/12) at 124.)

The health department determinations reviewed by the ZEO are "seasonal use only" stamps that were placed on the assessor's street cards in 1988 and 1989 by Marilyn Swaney, the former assistant to Frank Kneen, a former health department employee. (Tr. (4/13) at 130.) According to both Ms. Swaney and Ronald Rose, a health department building inspector, the stamp was marked on those properties that Mr. Kneen believed were unable to support an adequate septic system for year-round use. (Tr. (4/12) at 134–35; Tr.

---

**6.** The Defendants claim that § 8.8.1 of the 1992 Regulations originally prohibited the enlargement or conversion of seasonal properties to year-round properties on non-conforming lots, and, therefore, that 1992 is the relevant benchmark for determining whether a non-conforming year-round use existed and should be grandfathered.

(4/13) at 128.) Mr. Kneen performed field inspections and then placed a red "x" on a town map to indicate to Ms. Swaney which street cards required stamps. The stamp was not affixed based on a determination of actual use of the property, and, in fact, was sometimes affixed despite known actual year-round use. (Tr. (4/13) at 141.)

In addition to the assessor's records and the health department determinations, the ZEO reviews any building permit applications connected to the property that she happens to know about or that appear in her zoning file. (Tr. (4/12) at 153.) One of the sections on the permit forms, under "Existing Status," requires the applicant to check either "seasonal" or "year-round." (Defs.' Exs. E, F, & G.) It is significant to note, however, that seasonal is not defined on the form. Mr. Lawrence Lapila, owner of 20 Swan Avenue Old Lyme, Connecticut, testified that the contractor checked the seasonal space on his application to improve his property. Further, he stated that although he signed the application and saw the checkmark, he did so thinking it meant part-time use and that 20 Swan Avenue was not his primary residence; he did not understand seasonal to mean that he never used the house during the winter months. (Tr. (4/13) at 145–46, 149–50; Pls.' Ex. 14.) Mr. Lapila maintains that he and his family have always made periodic use of their house on weekends during the wintertime.

Based upon the seasonal use indications found on the assessor's cards, the health department stamps, and the building permit applications, the ZEO makes a preliminary determination and sends a notice to the property owner via regular mail. The letter includes the seasonal determination, a list of the records reviewed to make that determination, and a notice to the owner that he or she has sixty days to provide additional information if he or she disagrees with the finding, at which point a final determination will be issued. The notice also informs the owner that this preliminary finding is not a final determi-

nation, and, therefore, is not appealable to the Old Lyme Zoning Board of Appeals (ZBA). (Tr. (4/12) at 150–51; Tr. (4/13) at 72–75; Defs.' Ex. L.)

Following the sixty-day period, the ZEO considers any additional information provided to her by the property owner and then issues a final determination to the property owner via certified mail. The final determination letter includes the seasonal designation, lists the items reviewed, and informs the property owner that he or she has thirty days to appeal the decision to the ZBA and that, absent an appeal, the designation will be filed in the Old Lyme Land Records. (Tr. (4/12) at 151; Tr. (4/13) at 75–77; Defs.' Ex. M.)

The additional information accepted by the ZEO is generally limited to independent documentation showing year-round use prior to 1992. (Tr. (4/13) at 80–81.) For example, the ZEO has changed preliminary determinations of seasonal use to final determinations of year-round use based on pre–1992 electric bills, oil delivery statements, mail carrier records, rental leases, and school report cards. (Tr. (4/13) at 80–88; Defs.' Exs. O, P, Q, & R.) Testimonial evidence such as statements of property owners regarding their actual use of the property, and corroborating affidavits from neighbors or others who have knowledge of their use, in the absence of documentary evidence, is not considered sufficient evidence by the Zoning Commission to change a preliminary determination of seasonal use and prove year-round use prior to 1992. (Tr. (4/13) at 107–09.)

While it appears that testimonial evidence is not heard or considered by the ZEO, if a property owner appeals to the ZBA, he or she is entitled to testify, call witnesses, and present affidavits or letters from friends and neighbors. (Tr. (4/13) at 170–71.) No seasonal use determinations, however, have been overturned by the ZBA based on this type of additional evidence.

## II. LEGAL STANDARDS

■ A preliminary injunction "is an extraordinary and drastic remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). Generally, a party seeking to obtain a preliminary injunction must demonstrate (1) a threat of irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996); *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). When the preliminary injunction seeks to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme" the moving party must satisfy the more rigorous likelihood of success on the merits standard. *See Able v. United States,* 44 F.3d 128, 130 (2d Cir.1995). "This exception reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* When governmental action is taken pursuant to specific regulatory authority and public interests lie on both sides, however, the Second Circuit has held that the lower standard of serious-question-on-the-merits may apply. *See Time Warner Cable v. Bloomberg, LP,* 118 F.3d 917, 923–24 (2d Cir.1997). Here, the ZEO is acting pursuant to a regulatory scheme enacted by the Zoning Commission in the interest of public health and safety.[7] The relief Plaintiffs seek, however, would predominantly affect their private property interests in maintaining the nonconforming year-round use of their homes. Therefore, under these circumstances, the Court will apply the more rigorous likelihood of success standard.

■ Under certain circumstances, an even higher standard may apply. If the injunction sought "will alter, rather than maintain, the status quo," thereby classifying it as a "mandatory" rather than "prohibitory" injunction, the moving party must make a "clear" or "substantial" showing of likelihood of success on the merits. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir. 1995). While the Court recognizes that the "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities," the Court will not hold Plaintiffs to a clear or substantial showing. Because the relief sought by Plaintiffs would not require the ZEO to engage in a new course of conduct, but rather would require her to refrain from continuing to implement the systematic street-by-street seasonal use determinations, the Court concludes that the preliminary injunction sought is prohibitory in nature.

## III. DISCUSSION

### A. *Irreparable Harm*

■ An irreparable injury is one that is not remote or speculative but actual and imminent, *see id.* at 37, and "for which a monetary award cannot be adequate compensation." *See Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)).

Plaintiffs argue that irreparable harm should be presumed because the Second Circuit has held that the alleged deprivation of a constitutional right constitutes irreparable harm. Defendants contend that, while there is precedent supporting a finding of irreparable harm when the violation of a substantive right is alleged, due process clause violations, standing alone, have not been held to constitute irrepara-

---

**7.** As noted at the outset, Plaintiffs concede for the purpose of this motion only that the challenged zoning regulations were enacted for a lawful public purpose and are rationally related to public health, safety, and welfare. (Tr. (4/13) at 3–10.)

ble harm, and a factual demonstration of irreparable harm is thus required.

In *Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir.1984), the Second Circuit recognized that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *See id.* at 806 (quoting 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948, at 440 (1973)). Subsequently, the Second Circuit expanded on this general proposition, recognizing a "presumption of irreparable injury that flows from a violation of constitutional rights." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) (citing *Mitchell*, 748 F.2d at 806); *see also Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992). The *Jolly* court noted that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm." *See Jolly*, 76 F.3d at 482; *see also Scelsa v. City Univ. of New York*, 806 F.Supp. 1126, 1135, 1146 (S.D.N.Y.1992) (characterizing an alleged deprivation of constitutional rights as a "per se irreparable harm" while granting a preliminary injunction barring employment discrimination against Italian Americans).

While both *Mitchell* and *Jolly* involve Eighth Amendment claims by prisoners, there is no indication in these holdings that the presumption of irreparable harm is limited to the allegation of substantive constitutional rights to the exclusion of procedural due process claims. At the same time, however, the Second Circuit has also recently held that district courts should consider the nature of the constitutional injury before making a finding of irreparable harm. In *Time Warner Cable*, 118 F.3d at 924, while noting that "the impairment of First Amendment rights can undoubtedly constitute irreparable harm," the Second Circuit instructed lower courts that, "we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights."

Some district courts addressing the nature of an alleged due process claim have declined to find irreparable harm despite the alleged constitutional violation, but those findings have generally hinged on the fact that the movant could be made whole with money damages. *See, e.g., Air Transport International Ltd. Liab. Co. v. Aerolease Financial Group, Inc.*, 993 F.Supp. 118, 124–25 (D.Conn.1998) (finding that alleged due process violation regarding replevin of an airplane engine readily replaceable by other engines in the marketplace, is not "a systematic or ongoing constitutional violation that could not be remedied with a monetary award"); *Pinckney v. Board of Education*, 920 F.Supp. 393, 400 (E.D.N.Y.1996) (finding that despite constitutional due process claim, "this lawsuit is, at its core, a single plaintiff's claim for money damages"). These cases are consistent with the Second Circuit's insisting that "where monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Jayaraj*, 66 F.3d at 39. They do not, however, demonstrate as a matter of law that alleged due process violations are insufficient grounds for temporary relief.

Applying these standards, the Court finds that Plaintiffs have established irreparable harm because, as discussed below, the plaintiffs have presented sufficient evidence to establish that the continued implementation of the systematic seasonal use determinations subjects them to an unconstitutional procedure, potentially depriving them of vested property rights. Further, because the consequence of an erroneous seasonal use determination resulting from this flawed process would deprive Plaintiffs of total use of their property between November and April of every year, the harm can not be redressed by a monetary award. Defendants' contention, therefore, that Plaintiffs fail to establish irreparable harm because they make no

claim that a seasonal designation would cause the property to lose value or marketability, is inapposite.

### B. The merits of Plaintiffs' procedural due process claim

Plaintiffs claim that the implementation of the systematic seasonal determinations violates their constitutional rights under the Fourteenth Amendment, which provides: "[n]or shall any State deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. To support this claim, Plaintiffs must first establish the existence of a constitutionally cognizable property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972); *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir.1998); *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 628–29 (2d Cir.1996), *cert. denied*, 519 U.S. 1150, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997). While the Constitution protects property interests, it does not create them. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Furlong*, 156 F.3d at 393 (citing *Board of Regents*, 408 U.S. at 577, 92 S.Ct. 2701).

Plaintiffs assert that the property right at stake in this case is the right to maintain a non-conforming use; a right rooted in Connecticut state law. Connecticut General Statutes § 8–2(a) provides that zoning regulations "shall not prohibit the continuance of any non-conforming use, building or structure existing at the time of the adoption of such regulations." In *Petruzzi v. Zoning Board of Appeals*, 176 Conn. 479, 484, 408 A.2d 243, 246 (1979) (quoting 2 Yokely, *Zoning Law & Practice* § 16–3 at 219), the Connecticut Supreme Court held that "[a] lawfully established nonconforming use is a vested right and is entitled to constitutional protection."

Defendants, however, contend that the property interests Plaintiffs claim are "benefits" rather then vested property rights and, as such, are subject to the "strict entitlement" test for establishing constitutionally protected interests.[8] Defendants characterize Plaintiffs' asserted interests as (1) the enforcement of zoning regulations against other landowners, and (2) the benefit of a "year-round" designation. The Court finds both characterizations inaccurate.

First, Plaintiffs claim a property right in the use of their own land; nowhere do they claim an interest in enforcing zoning regulations as they relate to benefits conferred upon their neighbors. Second, while it is true that establishing the existence of a non-conforming use in this situation results in a year-round designation by the ZEO, the right Plaintiffs assert is the right to maintain the pre-existing lawful use of their property. The ZEO testified that part of making the current seasonal use determinations involves determining who used their property on a year-round basis prior to the 1992 Regulations allegedly making that use non-conforming. Therefore, a year-round designation for those people cannot be characterized as a new benefit.[9] Because the Court finds both characteriza-

---

8. "This Circuit uses the strict 'entitlement' test to determine whether a party's interest in a land-use regulation is protected under the Fourteenth Amendment. This inquiry stems from the view that a property interest can sometimes exist in what is sought—in addition to what is owned—provided there is a 'legitimate claim of entitlement' to the benefit in question." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir.1995) (internal citations omitted).

9. Although courts have characterized permit applications, variance requests, and other necessary approvals as "benefits" subject to the strict entitlement test, *see Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir.1996); *Zahra*, 48 F.3d at 680; *Donegan v. Town of Woodbury*, 863 F.Supp. 63, 64–65 (D.Conn.1994), the plaintiffs here seek to protect rights that pre-exist the applicable zoning regulations, and, therefore, do not classify as benefits.

tions inaccurate, Defendants' argument that the strict entitlement test applies is without merit. As discussed above, it is clear under Connecticut law that lawfully established nonconforming uses constitute vested property rights entitled to constitutional protection.

 Having satisfied itself that a protected property right is at stake, the Court must now address what process is due. Procedural due process is not a fixed concept, but rather is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *see also J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 392 (2d Cir.2000). In evaluating due process claims when the alleged deprivation is by an administrative action, we look to the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The factors assess 1) the private interest affected by the challenged action; 2) the risk of erroneous deprivation of that interest through the challenged procedure and the probable value of alternative safeguards, and 3) the government's interest in avoiding the burden that an alternative procedure would entail. *See id.; see also Abdullah v. INS*, 184 F.3d 158, 164 (2d Cir.1999).[10]

Plaintiffs challenge the systematic seasonal use determinations on two grounds. First, they claim that the selection of January 1, 1992 as the date ending the vesting of the right to use residential properties on a year-round basis is improper because the regulations actually prohibiting that use were not enacted until June 5, 1995. Second, Plaintiffs claim that, even if 1992 is

the proper vesting date, the procedures utilized by the ZEO to evaluate claims of non-conforming year-round use fail to sat-, isfy minimal requirements of due process.

There is considerable debate in the parties' briefs comparing the 1992 and the 1995 regulations in terms of when and whether year-round use of properties in R–10 zones was prohibited, whether only conversions of property are restricted, and whether seasonal use restrictions apply to nonconforming lots versus nonconforming uses. Because the Court finds the procedure for determining the non-conforming use flawed irrespective of the date, the Court does not reach these issues or the proper vesting date on this motion.

 Turning now to the challenged procedure, and applying the *Mathews* factors set out above, the Court finds that Plaintiffs have established a likelihood of success in establishing a violation of their constitutional due process rights. The first factor addresses the private interest at stake. As discussed above, Plaintiffs claim a right to maintain the non-conforming use of their property; a right grounded in Connecticut law. If deprived of this right, Plaintiffs lose total use of their property for five months of every year. The affected private property interest, therefore, is significant.

Second, the Court must analyze the risk of error. Both parties agree that one of the issues involved in making the systematic seasonal use determinations is deciding whether a property owner has a pre-existing vested right in the non-conforming use of her property on a year-round basis. Further, the parties agree that the factual question underlying this issue is actual use

---

**10.** Defendants, citing, among others, *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir.1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998), argue that the reckless and/or deliberate indifference standard for assessing procedural due process violations applies to this situation. This standard, and the mental state of a governmental official, would

only be relevant if Plaintiffs claimed that the ZEO was acting negligently or recklessly in enforcing the systematic procedure set out in § 21.2.5 of the Zoning Regulations. The mental state of the ZEO in making seasonal use determinations was not placed at issue at the hearing. The Plaintiffs here challenge the administrative process itself; therefore, Defendants' argument is without merit.

of that property during winter months prior to either 1992 or 1995. Plaintiffs claim that the procedure employed by the ZEO fails to properly address that factual question, and the Court agrees.

The ZEO's preliminary determination is based on a review of town records which essentially have nothing to do with an owner's actual use of her property. Furthermore, and quite astonishingly, the ZEO admitted that she did not know the criteria on which those records made seasonal use determinations and was unable to adequately explain how or why their seasonal use indications were relevant to her inquiry of actual use. (Tr. (4/12) at 158–59; Tr. (4/13) at 18–22.) The street cards generated by the assessor's office are not the result of an investigation into actual use of property during winter months. Rather, they include information collected to value the property for tax purposes, attained from a single inspection, made at an unknown time of year, in either 1980 or 1990. At best, this information falls two years shy of the 1992 vesting date and seven years shy of the 1995 date. Further, other information from the street card relied upon by the ZEO, such as type of water supply and type of heating system, reflect the capability of the property to be used on a year-round basis, not whether the property was actually used as such.

Similarly, the "seasonal use only" stamps applied by the health department are out-dated and not the result of an inquiry into actual use of the property. The stamps were affixed in 1988 or 1989 and indicate which properties, in Mr. Kneen's estimation, were unable to support adequate septic systems for year-round use, regardless of actual use.

Finally, the permits occasionally relied upon by the ZEO come closer to addressing the factual question of actual use, but are flawed nonetheless. First, as Mr. Lapila testified, it is the contractor who fills out this portion of the application. Second, the space for indicating seasonal versus year-round use appears without definition. The Court finds credible Mr. Lapila's explanation that seasonal to him meant part-time; not use limited strictly to April through November.

Taken together, these records do little to address the dispositive question of actual year-round use prior to either 1992 or 1995. Furthermore, the preliminary determination process involves no discussion with the property owner and no discussion with neighbors—two inquiries that would directly address use of the property. The risk of an erroneous preliminary determination by the ZEO, therefore, is glaring.

Although property owners have sixty days to challenge this finding before a final determination is entered, they are only able to do so with documentary evidence such as bills. For owners who have not kept historical records on the use of their property, this opportunity is meaningless. Based on the testimony of Mr. Lapila and upon review of his file, (Pls.' Exs. 14 & 15), it is clear that phone calls, letters, and affidavits attesting to the year-round use of that property receive little, if any, consideration. In the face of eleven letters from contractors, caretakers, neighbors, and family members, the ZEO maintained her preliminary finding of seasonal use, which was based solely on the street cards, the health department stamps, and building permits, all of which, as discussed above, have little relevance to Mr. Lapila's actual use of his property.[11]

Mr. Lapila's experience indicates that the procedure employed by the ZEO fails

---

**11.** Much is made by Defendants about Mr. Lapila's alleged admissions of seasonal use by the check marks made on the building permits and a letter he wrote to the ZEO on January 11, 1999. (Defs.' Ex. T.) The Court finds Mr. Lapila's explanations credible that the seasonal checks were not signed with the understanding that the property was not used at all during the winter months, and that the only thing Mr. Lapila admitted to in the January 11, 1999 letter was that he did not live in the property full-time during the winter. (Tr. (4/13) at 145–46, 172–73.)

to provide property owners with an adequate opportunity to be heard prior to a final determination on their property. The "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). This principle is particularly important in light of Conn. Gen.Stat. § 8–2(a) which provides that zoning regulations "shall not provide for the termination of any non-conforming use solely as a result of nonuse ... without regard to the intent of the property owner to maintain that use." [12] This provision indicates that the property owner's intent in determining the existence and continuation of nonconforming uses is significant and must be considered. Therefore, the ZEO's policy against considering letters and sworn affidavits made by the owners and their neighbors is troubling. The failure to consider this relevant information denies owners a meaningful opportunity to be heard prior to the final determination, and further increases the risk of error.

The final consideration for the Court is the Town's interest. The significant property interest at stake, and the considerable risk of error under the current system must be weighed against the Town's interest in continuing the process in this format. The Defendants, in their brief, list a parade of horribles that might occur if they are temporarily enjoined from continuing with the systematic procedure altogether, but they present no evidence, nor make any argument, regarding the potential burden of alternative procedural measures to ensure that accurate determinations are made.

In sum, while the Court does not dispute the public health and safety interests underlying the 1995 Regulations, the Court finds that the potential burden imposed on the ZEO and the Zoning Commission of alternative procedures, such as interviews or consideration of affidavits and letters, does not outweigh the significance of the property right at stake and the considerable risk of error under the current system. Therefore, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits on their due process claim.

C. *Entitlement to Preliminary Injunction*

The Second Circuit recently instructed that "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable*, 118 F.3d at 929. Defendants, through the testimony of Mr. Grecci and Mr. Curtis, revealed the potential impact of nitrogen pollution if all seasonal use properties are converted to year-round use properties. As noted above, the Court does not dispute the public health and safety concerns underlying the 1995 Regulations, as their validity is not at issue on this motion. These concerns, however, address the potential conversion of properties from seasonal to year-round use. The process at issue on this motion does not deal with conversion of property; rather, it determines in the first instance whether the property was actually used on a year-round basis prior to either 1992 or 1995, thereby establishing a vested nonconforming use. The properties at issue are ones that possibly are already used year-round,

**12.** This portion of § 8–2 was enacted in 1989, superceding the Connecticut Supreme Court's ruling in *Essex Leasing, Inc. v. Zoning Board of Appeals*, 206 Conn. 595, 539 A.2d 101 (1988), which had empowered municipalities to terminate nonconforming uses based on nonuse without regard to the owner's intent.

The statute is consistent with the Connecticut Supreme Court's prior ruling in *Dubitzky v. Liquor Control Commission*, 160 Conn. 120, 125–27, 273 A.2d 876, 879–80 (1970), where it held that manifest intent must be established before a nonconforming use can be deemed terminated.

and, therefore, do not present the risk of a dramatic increase in use of property.

Defendants also claim that granting a preliminary injunction will have a devastating effect on the Town because it will allow illegal uses of property to go undetected, and encourage owners to delay permit applications for winterization. As noted below, however, this order does not affect the applications for conversion of property nor does it condone illegal use. These concerns do not outweigh the harm to owners if they are erroneously deprived of total use of their property for five months of every year. The Plaintiffs, therefore, have satisfied the requirements for injunctive relief on their due process claim.

## IV. CONCLUSION

In summary, Plaintiffs' Motion for a Preliminary Injunction is GRANTED [doc. # 5]. The ZEO is preliminarily enjoined from proceeding with the enforcement of the systematic street-by-street seasonal determinations until final disposition of the merits of Plaintiffs' complaint. This order, however, does not allow property owners to establish new year-round use, nor does it stop the ZEO from preventing illegal use of property during winter months. Further the order does not preclude the ZEO from continuing to require permit applications for renovations and conversions, nor does it preclude the ZEO from making seasonal determinations upon voluntary request by an owner.

So ordered.