**Robert MURPHY and Mary Murphy Plaintiffs,**

v.

**ZONING COMMISSION OF THE TOWN OF NEW MILFORD, et al. Defendants.**

No. CIV. 3:00 CV 2297 (HBF).

United States District Court, D. Connecticut.

July 5, 2001.

Vincent P. McCarthy, McCarthy Law Offices, New Milford, CT, for Plaintiffs.

Steven E. Byrne, Law Offices of Thomas P. Bryne, Farmington, CT, for Defendants.

### RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

FITZSIMMONS, United States Magistrate Judge.

In this action, plaintiffs allege violations of their constitutional rights, including the rights to free exercise of religion, free association, peaceable assembly, privacy, and speech, as well as due process, equal protection, takings, and establishment clause violations. [Doc. # 12, 35.] Plaintiffs also allege that defendants engaged in illegal reverse-spot zoning, an *ultra vires* act in violation of the town laws; and violated the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.*, in addition to various state constitutional rights and state statutory provisions. [*See id.*]

On December 21, 2000, Judge Eginton granted plaintiffs' *Motion for a Temporary Restraining Order.* [Doc. # 17.] This court heard evidence on plaintiffs' *Motion for Preliminary Injunction* [Doc. # 3] on January 18, 2001.[1] At the close of

---

1. On January 10, 2001, the parties consented to the magistrate judge's exercise of this court's jurisdiction. [Doc. # 20.]

the preliminary injunction hearing, the court ordered further briefing on several issues. [Doc. # 29.] The parties submitted responses to the court's inquiries on March 12, 2001. [Doc. # 33, 34.] The Court delayed a ruling to give the parties time to discuss a settlement.

For the reasons discussed below, plaintiffs' *Motion for Preliminary Injunction* **[Doc. # 3] is GRANTED. Defendants are enjoined from enforcing the cease and desist order issued to plaintiffs by the Zoning Enforcement Officer on December 19, 2000.** This ruling is without prejudice to plaintiffs seeking further interim relief if faced with actions by the defendants which threaten the plaintiffs' rights while the case is pending, or permanent injunctive relief if plaintiffs prevail on the merits. *See Sierra Club v. United States Army Corps. of Eng'rs*, 732 F.2d 253, 256 (2d Cir.1984) (preliminary injunction issues to maintain the status quo pending a resolution of the case on the merits).

*FINDINGS OF FACT*

1. Plaintiffs Robert Murphy and Mary Murphy are the owners of, and have resided at, 25 Jefferson Street, New Milford, Connecticut for approximately 28 years. [Preliminary Injunction Hearing Transcript, Jan. 18, 2001, "T.," at 52]

2. Plaintiffs' home is in a single family residential neighborhood, at the end of a cul-de-sac [T. 15], on which seven houses are located [T. 117]

3. Plaintiffs started hosting prayer group meetings in their home on Sunday afternoons in 1994, after Mr. Murphy became ill. [T. 12]

4. Mr. Murphy testified that he and his wife and six children had always hosted various social gatherings in their home and would often have 50 to 60 guests, depending on the event. [T. at 12–14]

5. Mr. Murphy also testified that during these events, people would park their cars "anywhere they could" … "[o]ut in the circle down the street, in the backyard, in the driveways, in their yard, [or] in the front lawn." [T. 14]

6. The prayer meetings generally last from 4:30 to 6:30 p.m. on Sunday afternoons. [T. 17]

7. Some people who attend the prayer meetings come earlier than 4:30 p.m. for other matters, such as fund-raising or clothing or food donation drives, and many people stay after 6:30 p.m. for dinner. [T. at 16–17]

8. Plaintiffs do not limit the number of people they invite to the prayer group meetings. [T. 18]

9. Plaintiffs' meetings are not open to the general public. [T. at 19–20]

10. The number of people attending the prayer group varies, but is never less than ten to twelve people. [T. 44]

11. The prayer group meetings generally take place on an enclosed porch at the back of the house. [T. 18]

12. The number of people attending the weekly prayer group meeting has declined, in part because of the enforcement action and the town's position since "they're afraid [they will be] arrested." [T. 45]

13. Mr. Murphy testified that the weekly prayer group meetings are an important part of his faith because of the way he was raised and, for him, did not take the place of church. [T. at 20–22] He testified that the prayer meetings brought "him closer to God" and changed his life after he became ill. [T. 22]

14. Mr. Murphy testified that his religious beliefs required him to hold the prayer group meetings on Sunday and that enforcement of the cease and desist order

would impede his ability to practice his beliefs. [T. at 46, 48–49]

15. Plaintiffs built an addition to their home in August 2000, creating a new garage with an upstairs living area. [T. 71] At that time, the existing driveway stopped at the addition. Plaintiffs then built a roughed-in driveway to a handicapped-parking area at the back of the addition. [T. at 24–25]

16. Plaintiffs obtained a permit to pave the rough portion of the driveway and the handicapped parking area in November 2000. [Pl. Exh. 1A, 1B] Plaintiffs did not pave the driveway during the fall because it was too late in the year, but indicated that they planned to do so in the future. [T. 28]

17. The Zoning Commission and the Zoning Enforcement Officer ("ZEO") have no authority to issue or revoke driveway permits. Rather, this authority is vested in the Mayor's office and in the public works department. [T. 68]

18. Around August 2000, the zoning office began receiving complaints about plaintiffs' meetings because of traffic concerns, parking on the street, and parking in the rear yard. [T. at 83, 116]

19. After complaining to the zoning office, the neighbors then began expressing their concerns at the public participation sessions of the New Milford Zoning Commission ("Commission") meetings. [T. 83]

20. Once the Commission began receiving these complaints from plaintiffs' neighbors, it instructed the ZEO to investigate the situation and to speak with the plaintiffs. [T. at 84, 118]

21. Plaintiffs' neighbors submitted letters to the commissioners detailing their concerns. Specifically, the neighbors' concerns stemmed from the increased flow of traffic on the street and fear that, in the event of an accident, emergency personnel would be unable to maneuver around the vehicles. The neighbors also expressed concerns about the safety of children playing in the cul-de-sac. [Def. Exh. 512–514]

22. The police have been called to plaintiffs' home on several occasions due to complaints about the number of parked cars, but plaintiffs have not been cited for any violation. [T. at 35–36]

23. After her investigation of the neighbors' complaints, the ZEO requested that the Commission issue an opinion on whether plaintiffs' use of their property conformed with the town's zoning regulations. [T. 165]

24. On November 28, 2000, the Commission issued an opinion regarding whether the Sunday meetings were a permitted use under the zoning regulations. [Def. Exh. 516]

25. The Commission found that regularly scheduled meetings are not a customary accessory use in a single-family residential area. [Def. Exh. 516, at 3.] In determining whether a particular use is a "customary accessory use," the town uses a case-by-case analysis and relies upon no zoning guidelines.

26. The Commission stated that:

[s]uch regularly scheduled meetings together with the construction and use of the parking lot associated therewith, in the opinion of the commission, do not constitute a permitted principal use of a single-family home in an R–40 zone because they are not listed as such in the zoning regulations, nor do they constitute a permitted accessory use because, to the knowledge of the commission, such a use has not been commonly, habitually and by long practice been established as reasonably associated with a single-family home in an R–40 zone.

[Def. Exh. 516, at 4.]

27. Plaintiffs received a letter from the ZEO on November 29, 2000, stating that

the meetings plaintiffs held on Sunday afternoons were prohibited and that plaintiffs were not permitted to use their rear yard as a parking lot for the attendees of these meetings. [Pl. Exh. 2]

28. The ZEO testified that the zoning regulations do not permit a large assembly of people in a single-family residential neighborhood. [T. 107] When asked what was too large, the ZEO responded that there was not a set number. [See id.] The decision turned on when the number of people assembled became so large that it had a negative impact on the neighborhood. [See id.]

29. The ZEO did not know if the Commission investigated whether other people had prayer group meetings in their homes, or other regular group meetings, such as Cub Scout meetings.

30. Prior to issuing their opinion, commissioners were given photographs taken by plaintiffs' neighbors of cars parked in plaintiffs' backyard and on the cul-de-sac. [T. 74; Def. Exh. 505–511]

31. The ZEO testified that she visited plaintiffs' property on three Sundays and found that the number of cars in plaintiffs' driveway or rear yard and in the cul-de-sac ranged from 13 to 20 cars. She did not find that any of the parked cars blocked access to any of the neighbors' properties. [T. at 75–76]

32. On December 19, 2000, the ZEO issued a cease and desist order, charging plaintiffs with violations of the single-family district regulations

which [do] not permit use of said premises as a meeting place by a diverse group of people (25 to 40), who are not "family" as that term is defined in these regulations, on a regularly scheduled basis, in this instance each Sunday, throughout the year; nor do the regulations permit the use of a parking lot in

the rear yard of said premises which is being used to meet the parking needs of those persons attending the meetings on property located in the Residential Zone in the Town of New Milford.

[Pl. Exh. 4]

33. The cease and desist order was based on the Commission's opinion, but the ZEO was not required by the opinion to issue the order. [T. 112–13]

34. Cease and desist orders are normally appealed to the Zoning Board of Appeals. No appeal has been taken in this case. [T. 113]

35. On January 9, 2001, the ZEO sent plaintiffs another letter, which stated that the temporary restraining order issued by Judge Eginton did not address plaintiffs' use of their rear yard as a parking lot and, as a result, the "parking lot prohibition could be enforced." [Pl. Exh. 3]

36. Brooks Temple, a New Milford zoning commissioner, testified that plaintiffs' neighbors raised their safety concerns during the public participation session of each Commission meeting. [T. 119]

37. Temple stated that the complaints were raised over a four month period and the neighbors' concern seemed to be that the activities surrounding plaintiffs' meetings were escalating. [T. 117]

38. The Commission found that there were, on average, 40 people attending the meetings, with 25 to 40 cars on average. [T. at 118–19] These numbers appeared to be based on statements from the neighbors, as well as individual commissioners' observations.

39. Temple testified that the Commission tried to balance everyone's rights, including plaintiffs' right to have meetings in their homes. [T. 120] Temple testified that regularly scheduled meetings would be a usual activity in a single family resi-

dential area but that, in this case, the volume of cars raised a safety issue the Commission needed to address. [T. 123]

40. Temple stated that all prayer meetings would not be prohibited, and that it was an expected accessory use that people would pray in their homes. [T. at 131–32] The Commission did not intend to prohibit all prayer groups or all meetings in residential areas. [*See id.*]

41. The zoning regulations in effect at the time of the Commission's opinion were permissive, providing that a use is prohibited unless it is specifically permitted. [T. at 122–23; Def. Exh. 515]

42. The regulations do not specify the expected accessory uses for particular areas, and Temple agreed that the determination was subjective. [T. 133]

43. The Commission's investigation of the complaints did not substantiate the safety concerns, but found an increased volume of cars that would increase traffic and could create a potential for safety concerns. [T. 123]

44. Temple testified that the key to the Commission's decision was the presence of larger activity than what could be expected in a single family home. [T. 137] In this situation, the Commission found that "too large" was 25 or more people. [T. 137] Temple admitted that the number was completely subjective. [T. 138]

45. Temple also testified that the Commission had no objective criteria to determine whether to issue a special use permit for the prayer group meetings. [T. 145–47]

46. The zoning regulations list twenty-five uses allowed by special permit in residential areas. There are no criteria listed in the regulations under which the commissioners are to evaluate special permit applications for a use not listed in the regulations. [Def. Exh. 515]

47. Once the Commission finds that a use is not permitted, the applicant's options are to apply for a special use permit or, if the Commission issued a decision, to appeal the decision to the Zoning Board of Appeals. [T. 124]

48. The Commission's decision was based on an evaluation of the complaints, concern about safety implications, and "common sense." [T. at 132, 139]

49. There is no evidence of religious animus on the part of plaintiffs' neighbors, the Commission, or the ZEO.

*STANDARD*

The question presented by plaintiffs' motion for preliminary injunction is whether the defendants' efforts to stop plaintiffs from having regularly scheduled meetings, which sometimes include 40 or more guests, in their home on Sunday afternoons violate any of plaintiffs' constitutional or statutory rights.

■ It is axiomatic that a plaintiff seeking a preliminary injunction must demonstrate: "(a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (citations omitted). *See also Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991). "However, in a case in which the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Charette v. Town of Oyster Bay,* 159 F.3d 749, 754 (2d Cir.1998), quoting *Bery v. City of New York,* 97 F.3d

689, 694 (2d Cir.1996) (internal citations omitted). *See also Beal v. Stern*, 184 F.3d 117, 122 (2d Cir.1999); *South Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 121 F.Supp.2d 195, 203 (D.Conn.2000).

■ Here, the Commission and the ZEO acted pursuant to the Town of New Milford zoning regulations. No evidence has been provided to indicate that the zoning regulations were not enacted in the public interest. Thus, the Court finds that plaintiffs must meet the likelihood of success on the merits standard in order to have their motion for preliminary injunction granted.

■ The moving party must make a showing of clear or substantial likelihood of success on the merits if the injunction sought "will alter, rather than maintain the status quo" or "will provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995). The Court will not hold plaintiffs to the higher standard of clear likelihood of success, as the relief sought would only require the ZEO to refrain from enforcing the cease and desist order—relief that is prohibitory in nature.[2]

A. IRREPARABLE HARM

■ Irreparable harm means that type of injury for which a monetary award would fail to be adequate compensation. *See Jackson Dairy*, 596 F.2d at 72; *Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm. Town of Fairfield*, 790 F.Supp. 1197, 1208 (D.Conn. 1992). "In the context of a motion for

preliminary injunction, '[v]iolations of First Amendment rights are commonly considered irreparable injuries.'" *Charette*, 159 F.3d at 755, *quoting Bery*, 97 F.3d at 693. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") The Second Circuit has held that a "presumption of irreparable injury ... flows from a violation of constitutional rights." *South Lyme Prop. Owners Ass'n, Inc.*, 121 F.Supp.2d at 204, *quoting Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) (affirming grant of preliminary injunction to inmate's claim that his rights under the Religious Freedom Restoration Act and the Eighth Amendment were violated). *But see Amandola v. Town of Babylon*, 251 F.3d 339 (2d Cir.2001) (acknowledging that Second Circuit has not always presumed irreparable injury in cases alleging First Amendment violations, and has on occasion required a showing of irreparable harm, but without deciding issue).

In addition, the federal statute under which plaintiffs bring their claims was passed by Congress to "protect the free exercise of religion from unnecessary government interference" in the context of land use regulation. 146 CONG. REC. E1563–01 (daily ed. Sept. 21, 2000) (statement of Rep. Canady), 2000 WL 1369378. Since the statute was enacted for the express purpose of protecting the First Amendment rights of individuals, the allegation that defendants have violated this statute also triggers the same concerns that led the courts to hold that these viola-

---

2. This court concurs in the Second Circuit's observation that the differences between mandatory and prohibitory injunctions are "often more semantical than substantive." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir.1997) (internal quota-

tions omitted). *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 923–24 (2d Cir.1997) (noting that "[t]his Circuit has offered differing views on the appropriate standard for issuance of a preliminary injunction against government action").

tions result in a presumption of irreparable harm. *See Jolly,* 76 F.3d at 482 ("[A]l-though plaintiff's free exercise claim [under RFRA] is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that can not be adequately compensated monetarily.") (internal citations omitted). *See also Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir.2001).

Even if plaintiffs were required to show irreparable harm by establishing an actual chilling effect, plaintiffs have met this burden. As discussed further below, plaintiffs presented testimony that some participants in the prayer group meetings stopped attending the sessions out of fear that they would be arrested by town officials. This testimony was not refuted by defendants and is sufficient to provide evidence of a chilling effect on plaintiffs' right to associate, as well as their constitutional right to freedom of religion.

Thus, for purposes of deciding this motion, the Court finds that plaintiffs have satisfied the irreparable harm requirement of the preliminary injunction test by alleging violations of their constitutional rights and rights protected under the Religious Land Use and Institutionalized Persons Act.

## B. PRELIMINARY JURISDICTIONAL QUESTIONS

Before reaching the merits of plaintiffs' substantive claims, defendants raise two jurisdictional challenges to plaintiffs' case: 1) plaintiffs failed to exhaust the administrative remedies available to them; and 2) the claims are not yet ripe for judicial review. The court will address these in turn.

### 1. *Exhaustion of Administrative Remedies*

■ As a threshold matter, defendants argue that plaintiffs have failed to exhaust

their administrative remedies and therefore cannot pursue their claims in court. Plaintiffs respond that they are not required to exhaust state administrative remedies since they are bringing § 1983 claims against the zoning commission.

The Court agrees with plaintiffs that they are not required to exhaust the state administrative remedies before pursuing their § 1983 claim. The Supreme Court, in *Patsy v. Board of Regents of the State of Florida,* held that exhaustion of state administrative remedies was not a prerequisite to filing a § 1983 claim. 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). *See also Goldstar Auto Sales, LLC v. Town of Halfmoon,* 69 F.Supp.2d 361, 365 (N.D.N.Y.1999) (collecting cases); *Port Clinton Associates v. Board of Selectmen of Town of Clinton,* 217 Conn. 588, 587 A.2d 126 (Conn.1991).

Defendants' argument that the § 1983 exception to the exhaustion requirement is limited to cases seeking damages is not persuasive. In *Patsy,* the Supreme Court discussed the evolution of 42 U.S.C. § 1983 and its legislative history to determine whether Congress intended the exhaustion requirement to apply to these claims. Nothing in the legislative history or in the Supreme Court's opinion indicates that Congress intended to exempt § 1983 claims from the exhaustion requirement only if the claimant sought damages.

The cases cited by defendants are inapposite. Although each case deals with a claim for damages, there is no language in any of the cited cases that indicates a § 1983 claimant seeking injunctive relief is required to exhaust state administrative remedies. For example, defendants cite *Pet v. Department of Health Serv.,* for the proposition that "notwithstanding *Patsy* ..., the fundamental requirement of inad-

equacy of an available legal remedy in order to obtain injunctive relief remains in full force." 207 Conn. 346, 369, 542 A.2d 672 (1988); Doc. #34, at 8. Defendants also cite *Laurel Park, Inc. v. Pac*, for this same assertion. 194 Conn. 677, 485 A.2d 1272 (1984). While these statements are legally accurate, they do not support defendants' contention that plaintiffs are required to exhaust their administrative remedies. In fact, the *Laurel Park* decision expressly refutes defendants' contention. In *Laurel Park*, a case seeking injunctive relief from a cease and desist order, the Connecticut Supreme Court held that exhaustion of state administrative remedies was not required as the case alleged violations of § 1983, but that the trial court should not have granted the temporary injunction because plaintiff had not shown that a legal remedy would have been inadequate. 194 Conn. at 689–691, 485 A.2d 1272.

Defendants appear to have conflated these two distinct requirements. As clearly discussed in *Laurel Park*, the question of whether a claimant is required to exhaust state administrative remedies is conceptually distinct from the question of whether a party is entitled to injunctive relief after a showing that any legal remedy would be inadequate.[3] The *Patsy* opinion addressed only the exhaustion question and did not attempt to overturn the fundamental requirement of showing that a legal remedy is inadequate before receiving injunctive relief.[4] Defendants have not pro-

vided any other authority to support their assertion or any evidence that Congress did not intend to exempt all § 1983 claims from the exhaustion requirement regardless of the requested relief.

As plaintiffs have brought § 1983 claims in this suit, they were not required to exhaust state administrative remedies prior to initiating this action in federal court.

### 2. *Ripeness of Plaintiffs' Claims*

█. A separate jurisdictional inquiry is whether plaintiffs' claims are ripe for judicial intervention. Defendants argue that plaintiffs' claims are not ripe for review as there was no enforcement action taken as of the date the Amended Complaint was filed, so no final action has been taken, and plaintiffs will therefore not suffer any hardship if judicial review is withheld. Plaintiffs respond that, because their claims are brought pursuant to 42 U.S.C. § 1983, they are not required to exhaust their administrative remedies.

As discussed above, plaintiffs are correct in their statement that they are not required to exhaust their administrative remedies prior to filing a § 1983 action. However, plaintiffs fail to recognize that the doctrines of ripeness and exhaustion are independent. The Supreme Court has explained this distinction by stating that

> [t]he question whether administrative remedies must be exhausted is conceptually distinct, however, from the question

---

**3.** In this case there is no suggestion that plaintiffs have failed to show the inadequacy of a legal remedy, as their complaint requests primarily equitable relief. [Doc. #12.] *See also Defendants' Legal Memorandum in Support of its Objection to Plaintiffs' Request for a Preliminary Injunction*, [Doc. #34, at 8] ("This action does not concern damages.")

**4.** Defendants also cite *Costello v. Town of Fairfield*, 811 F.2d 782 (2d Cir.1987), and *Solomon v. Emanuelson*, 586 F.Supp. 280

(D.Conn.1984), in support of their assertion that the § 1983 exemption to the exhaustion requirement only applies to claims for damages. The Court does not find either of these cases persuasive. Although it is true that in each case the claimant sought at least nominal damages, neither of these courts addressed the question of whether exhaustion was required when a § 1983 claimant sought injunctive relief.

whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192–93, 105 S.Ct. 3108, 3119–20, 87 L.Ed.2d 126 (1985) (internal citations omitted). The ripeness inquiry reflects the need to protect agency actions "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In *Abbott Labs.*, the Supreme Court held that, in determining whether the prudential component of the ripeness doctrine had been met, a court needed to balance two considerations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515.

The court acknowledges that there is merit to defendants' argument that, because the town as of the date the Amended Complaint was filed had taken no enforcement action, plaintiffs' claims are not ripe for review. However, in the context of this particular case, the court believes that, at a minimum, plaintiffs' claim that the Zoning Commission's actions violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA") is ripe for judicial review.[5] Because the Court finds that the plaintiffs' RLUIPA claim is ripe under the unique circumstances of this case, the Court orders plaintiffs to file a Second Amended Complaint incorporating the issuance of the cease and desist order by the ZEO.

Here, plaintiffs claim that the New Milford zoning regulations, as interpreted by the Commission and enforced by the ZEO, violate their rights under RLUIPA. The court finds unpersuasive defendants' argument that plaintiffs are required to appeal the cease and desist orders to the ZBA before the decision is final. RLUIPA contains no requirement that the town be given an additional opportunity to comply with the Act by forcing a plaintiff to pursue an appeals process prior to bringing suit under its provisions. *See Stuart Circle Parish v. Board of Zoning Appeals of the City of Richmond, Virginia*, 946 F.Supp. 1225, 1234 (E.D.Va.1996) (Court held that plaintiffs were not required to apply for a conditional use permit in order for action filed under the Religious Freedom and Restoration Act to be ripe.)[6]

---

5. For the purposes of ruling on the pending preliminary injunction, the Court declines to address whether the remainder of plaintiffs' claims are currently ripe. Defendants are welcome to address this question in a motion to dismiss.

6. The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et. seq.*, was the predecessor to RLUIPA. Congress enacted RLUIPA after the Supreme Court found RFRA unconstitutional as applied to the states

in *City of Boerne v. P.F. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Both RFRA and RLUIPA sought to rescind *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and to restore the pre-*Smith* "compelling interest/least restrictive means" standard when a plaintiff challenged the application of neutral, generally applicable laws to religious practices. *See City of Boerne*, 521 U.S. at 513–15, 117 S.Ct.

Rather, plaintiffs must show that defendants imposed or implemented a land use regulation that placed a substantial burden on their religious practices. *See* 42 U.S.C. § 2000cc. In making this showing for ripeness purposes, plaintiffs must demonstrate that the governmental decision that allegedly violates RLUIPA is a decision that burdens their religious beliefs or practices. On its face, RLUIPA requires only that the "final decision" made by the governmental agency be to implement or impose a land use regulation against an individual or entity.

At the preliminary injunction hearing, Mr. Temple testified that the opinion issued by the Commission that plaintiffs were in violation of the zoning regulations was not enforceable because there was not a pending case before it. However, once the ZEO issued the cease and desist order based on the Commission's interpretation, the opinion had the force of local law.[7] *See Bryant Woods Inn, Inc. v. Howard County, Maryland*, 911 F.Supp. 918, 927 (D.Md. 1996), *aff'd* 124 F.3d 597 (4th Cir.1997) (In a claim brought pursuant to the Fair Housing Act, the court found that even though plaintiff failed to appeal a Planning Board's decision to the Board of Appeals, "the County's highest agency decision-maker," the claim was ripe because the "unappealed decision . . . is final in the sense that it now constitutes the local law of Howard County . . . .") This Court finds that, by giving legal effect to the Commission's opinion, the cease and desist order constituted a final decision for purposes of analyzing whether plaintiffs' RLUIPA claim is ripe.

■ The cease and desist order would be a final decision even if plaintiffs had appealed the order to the Zoning Board of Appeals ("ZBA"). Although the ZBA has the power to reverse, modify, affirm or grant a variance to the appealed order,[8] the harm that the RLUIPA is designed to protect has already occurred. Once the cease and desist order gave legal effect to the Commission's opinion, the requirements of RLUIPA were triggered. The court is cognizant of language in the Act's legislative history that the statute "does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay." 146 CONG. REC. S7774–01, S7776 (daily ed. July 27, 2000) (Exhibit 1). However, the court does not find that this language requires all individuals bringing a claim under the RLUIPA to appeal all decisions or orders to the ZBA or to apply for special use permits regardless of the circumstances of the case.[9]

First, the legislative history uses the term "institutions," whereas the statute itself covers institutions, assemblies, and even more broadly, "the religious exercise of a person." 42 U.S.C. § 2000cc(a)(1). Also, this explanation appears in a section entitled "Additional Discussion on Intended Scope of Land Use Provision" and is

---

at 2160–62; *C.L.U.B. v. City of Chicago*, 2001 WL 321056, *11 (N.D.Ill. Mar. 30, 2001).

7. Violations of the cease and desist order would subject the plaintiffs to civil and/or criminal penalties in accordance with Connecticut General Statutes § 8–12.

8. *See* CONN. GEN. STAT. § 8–6 (West 2001).

9. This court expresses no opinion on whether or not RLUIPA claims brought in the future must first be appealed to the ZBA. The court's ruling on the pending preliminary injunction motion is limited to the particular facts and circumstances of this case.

immediately followed by an explanation of the interplay between the use of real property by a religious institution and the definition of religious exercise.[10] 146 CONG. REC. S7774–01. The context of this discussion leads the court to believe that the Senate sponsors of the bill inserted these explanations to help land use regulators in situations where an *institution* such as a church, temple, or synagogue, was subject to a land use regulation. For example, these explanations would provide guidance to regulators in the context of the construction of a new building, renovations of existing buildings, or even the operation by a religious organization of a commercial enterprise in the same building where the land use regulations placed a burden on the commercial entity.

The court has been unable to find, and neither party has presented, any evidence to indicate that Congress intended to *require* an *individual*, whose right to the free exercise of her religious beliefs has been substantially burdened by a town's land use regulations, to then appeal the town's decision or apply for a special use permit. In fact, a finding that an individual is required to appeal an order or apply for a special permit seems to run contrary to Congress' purpose of protecting the religious freedom of individuals. To require an individual whose free exercise rights have allegedly already been impermissibly burdened by a town's actions to appeal those actions could place an additional and distinct burden on the individual rights

RLUIPA was intended to protect.[11] As discussed above, since the alleged violation of RLUIPA occurred when the cease and desist order issued, the Court finds that requiring plaintiffs to appeal the order would subject them to additional burdens on the exercise of their religious beliefs in violation of the Act. Plaintiffs are not required to "acquiesce in the violation of [their] rights in order to avoid a claim that the injury is self-inflicted." *A.W. Chesterton Co., Inc. v. Chesterton*, 907 F.Supp. 19, 24 (D.Mass.1995) (ruling on preliminary injunction involving a shareholder suit in closely held corporation).

Finally, the plain language of the statute states that "standing to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the Constitution." 42 U.S.C. § 2000cc–2(a). Thus, the court turns its attention back to the general ripeness tests articulated by the Supreme Court and our Court of Appeals.

■ The Second Circuit in *Able v. United States* discussed a variety of factors it has considered in determining whether a claim was ripe for judicial determination. 88 F.3d 1280 (2d Cir.1996). These factors include

(1) whether the issue to be reviewed is more legal or factual in nature, (2) whether the agency action is likely to have an immediate and substantial impact upon the complaining party, (3) whether judicial review would delay or

---

**10.** As an example, a land use regulation burden on a "commercial building, which is connected to religious exercise primarily by the fact that the proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on 'religious exercise'." 146 CONG. REC. S7774–01, at S7776.

**11.** Because RLUIPA has recently been enacted, courts have not had the opportunity to

address this question. However, in the context of the Fair Housing Act, at least one court has held that it is impermissible and a distinct violation to require plaintiffs to appeal zoning decisions to the ZBA because this act in and of itself is burdensome. *See e.g., Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Commission of Town of Fairfield*, 790 F.Supp. 1197, 1209 (D.Conn.1992).

impede effective enforcement of the relevant administrative scheme, (4) whether the agency's actions are final, and (5) whether an adequate factual record has been established.

*Id.* at 1289–90, *citing Occidental Chem. Corp. v. FERC,* 869 F.2d 127, 129 (2d Cir.1989); *Seafarers Int'l Union of North America, AFL–CIO v. United States Coast Guard,* 736 F.2d 19, 25–27 (2d Cir.1984); *Aquavella v. Richardson,* 437 F.2d 397, 403–04 (2d Cir.1971). These factors deal primarily with the fitness of the issues for judicial review and are addressed in turn.

██ First, the issues before the court on the pending preliminary injunction motion are primarily legal rather than factual, and the parties have made a sufficient factual showing to enable the court to decide the remaining legal questions posed at this stage.

The next factor also supports a finding that plaintiffs' claim is ripe. The testimony at the preliminary injunction hearing provides evidence that action taken by defendants has already had an "immediate and substantial impact," in that Mr. Murphy testified that some people had stopped coming to the prayer group meetings because they were afraid of being arrested. *Able,* 88 F.3d at 1289.

The third factor considered by the Second Circuit, "whether judicial review would delay or impede effective enforcement of the relevant administrative scheme," is not determinative in this in-stance. Here, plaintiffs challenge the Commission's interpretation of a zoning regulation, which prevents them from having prayer group meetings above a given size in their home. Judicial review of this interpretation will not affect the town's implementation and enforcement of its general zoning regulations, as the review is limited to this particular interpretation, which has only been applied to this particular situation.

The last *Able* factor deals with the adequacy of the factual record before the court. For purposes of the preliminary injunction ruling, the Court finds that the record, as developed by the parties for this hearing, is sufficient given the parties' positions at this time and the court's narrow ruling on plaintiffs' RLUIPA claim.

Next, the court concludes with little difficulty that plaintiffs would "suffer greater hardship if judicial review is withheld than would the [defendants] if it is not." *Able,* 88 F.3d at 1290. As discussed above, plaintiffs allege that the town is placing a substantial burden on their religious practices in violation of RLUIPA and other constitutional guarantees, which constitutes an irreparable injury. The Court finds that, because plaintiffs potentially face the choice between complying with a cease and desist order that violates federally protected rights and facing civil and criminal penalties for violating the order, the hardship to which they are subject tips the balance in favor of finding this matter ripe for review.[12] *See D.H.L. Assoc., Inc.*

---

12. Again, the court notes that it is ruling on the narrow issue of plaintiffs' RLUIPA claim. The court agrees with defendants that there are serious questions as to whether plaintiffs' constitutional claims, particularly their takings claim, are ripe under the *Williamson County Reg'l Planning Comm'n v. Hamilton Bank* test. *See* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). However, plaintiffs have not addressed this argument in their papers and the court declines to rule on these defenses at this time. As a prudential matter, trial courts avoid constitutional claims when there is a narrower ground upon which to rule. *See Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944); *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985). The court expresses no opinion on the continued viability of plain-

*v. O'Gorman,* 199 F.3d 50, 53–54 (1st Cir. 1999), *cert. denied* 529 U.S. 1110, 120 S.Ct. 1965, 146 L.Ed.2d 796 (2000) ("it is clear that D.H.L. is subject to a real and immediate threat of enforcement of ... [the] zoning ordinance and therefore its claims are ripe for review"). Here, plaintiffs' harm is real, immediate, and threatens to continue.

As the Commission's opinion now constitutes the local law of New Milford, and plaintiffs will suffer immediate hardship if, in obedience to the cease and desist order, they must terminate the prayer group meetings they have been holding over the past seven years, the Court finds that their RLUIPA claim is ripe for review.

## C. LIKELIHOOD OF SUCCESS ON THE MERITS: R.L.U.I.P.A.

 Plaintiffs argue that the town's attempt to stop them from holding weekly prayer meetings in their home violates the Religious Land Use and Institutionalized Persons Act, enacted in 2000.[13] Section 2000cc states that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates the imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Once plaintiffs demonstrate the existence of a substantial burden on the exercise of their religious beliefs, the burden then shifts to the local government to show that the challenged action furthers a compelling state interest by the least restrictive means.

Defendants make two arguments that the court construes as defenses to the RLUIPA claim. Defendants initially claim that they have not placed a substantial burden on plaintiffs' religious practices. In support of this argument, defendants note that plaintiffs have acknowledged that, in order to have a prayer group, all that is needed is two or more people and that the town is not restricting a smaller number of people from gathering for the meetings. Defendants also argue that they have not violated the Act because the town acted in furtherance of a compelling state interest, namely, the enforcement of local zoning laws to protect the health and safety of the community.

### 1. *Substantial Burden*

On the current record, based on the testimony at the hearing, the court cannot agree that defendants' actions have not placed a substantial burden on plaintiffs' religious practices and those of others who attended those meetings before the town acted but have been deterred from further attendance by their fear of prosecution.

---

tiffs' constitutional claims, which will be better addressed in the context of a motion to dismiss.

**13.** Defendants have represented to the court that they plan to challenge the constitutionality of the RLUIPA. However, as neither side has briefed this issue, the court presumes the constitutionality of the Act, *see Bowen v. Kendrick,* 487, U.S. 589, 617, 487 U.S. 589, 108

S.Ct. 2562, 2578, 101 L.Ed.2d 520 (1988); *Walters v. National Ass'n of Radiation Survivors,* 468 U.S. 1323, 1324, 105 S.Ct. 11, 12, 82 L.Ed.2d 908 (1984); *Fairbank v. United States,* 181 U.S. 283, 285, 21 S.Ct. 648, 649, 45 L.Ed. 862 (1901), and leaves defendants to raise this challenge when they deem it appropriate.

The showing required for a "substantial burden" has not been fully articulated by the courts and has been defined in several ways. *See Hicks v. Garner*, 69 F.3d 22, 26 n. 22 (5th Cir.1995) (collecting cases interpreting "substantial burden" under the RFRA). Congress gave some guidance to the courts when it enacted the RLUIPA by indicating that it did not intend to change traditional Supreme Court jurisprudence on the definition of substantial burden. *See* 146 CONG. REC. S7774–01, S7776. Although Congress expressed its intent not to change this definition, it expressly defined "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). *See also Kikumura v. Hurley*, 242 F.3d 950, 960–61 (10th Cir.2001) (discussing RLUIPA definition of "exercise of religion" in the context of the substantial burden requirement and remanding for evidentiary hearing on whether plaintiff met this element). Thus, by not limiting the scope of the Act's protections to the exercise of religious beliefs compelled by or central to a particular faith, Congress now requires that some of the language used by the Supreme Court in discussing "substantial burden[s]" be applied in a broader context.

"Substantial burden" has been defined or explained in various ways by the courts. *See Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) (exists where state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (occurs when a person is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion ... on the other"); *Bryant v.*

*Gomez*, 46 F.3d 948, 949 (9th Cir.1995) (state action "prevent[s] him or her from engaging in conduct or having a religious experience that is central to the religious doctrine"); *Reese v. Coughlin*, 1996 WL 374166, *6 (S.D.N.Y. July 3, 1996), *quoting Davidson v. Davis*, 1995 WL 60732, *5 (S.D.N.Y. Feb.14, 1995) (same). This burden must be more than an inconvenience to the plaintiffs, but the court's "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996).

The Court finds, based on the evidence presented at the preliminary injunction hearing, that plaintiffs have demonstrated that defendants' actions have placed a substantial burden on their religious exercise. Although defendants are not precluded from doing so at trial, at no time during the preliminary injunction hearing did they question the sincerity of plaintiffs' beliefs, or characterize those beliefs as anything other than religious in nature. Thus, the court has focused on whether plaintiffs' religious exercise is substantially burdened by the defendants' actions.

The court rejects defendants' contention that the burden is not substantial because the purpose of plaintiffs' prayer group sessions is fulfilled as long as there are "two or more people present." Defendants' argument misses the point. First, Mr. Murphy testified that people who previously attended the prayer group meetings were no longer participating because the Town's actions made them afraid they would be arrested. [T. 45] Although defendants stated in court that people would not be arrested over a zoning issue [*see id.*], plaintiff's testimony about the chilling effect of the cease and desist order on third parties was not refuted. The Court finds that the allegation that people are afraid to attend a prayer group meeting because

they fear being arrested is a substantial burden that the defendants have imposed on the prayer group participants. Foregoing or modifying the practice of one's religion because of governmental interference or fear of punishment by the government is precisely the type of "substantial burden" Congress intended to trigger the RLUIPA's protections; indeed, it is the concern which impelled adoption of the First Amendment.[14]

Moreover, the defendants' actions have imposed a substantial burden directly on plaintiffs. Mr. Murphy testified that the prayer group sessions were an important part of his life because he believed that God and prayer saved his life, and the prayer group meetings helped the participants and others who were having difficulties in their lives. [T. at 23, 43–49.] Patrick Murphy, plaintiffs' son and one of the organizers of the meetings, testified that he did not want the prayer group meetings to be limited to twenty-five people or fewer because part of the purpose of the meetings was to help people in need and, if a twenty-sixth person needed the help of the prayer group, he did not want to turn that person away. [T. at 159–60.] Patrick Murphy stated that this limitation would affect the members of the group because it would defeat "the whole intent of our prayer group . . . ." [T. at 160.]

The evidence established that plaintiffs exercise their faith in part by praying with others, with the express purpose of helping those in need through prayer. The court recognizes that, at the time of the hearing, it had been several months since plaintiffs had had more than twenty-five people at a prayer group meeting. [T. at 160.] However, the mere fact that the defendants' limit on the number of people attending the group has not recently been violated does not mean that the burden imposed is insubstantial. Based on the testimony at the injunction hearing, the Court finds that requiring plaintiffs to ensure that the number of attendees of a meeting never exceeded twenty-five would place a substantial burden on the exercise of plaintiffs' religion. This limitation could have a significant impact on the purpose of the prayer sessions if plaintiffs were forced to turn someone away who wanted to participate because twenty-five other people were already present. Plaintiffs' faith is also premised on the belief that prayer can heal those who are ill or in need, a belief expressed through the group meetings. To require plaintiffs to turn people away whom plaintiffs believe can and should be helped by the group's prayer forces them to modify their religious practices and to choose between their expression of these beliefs on the one hand, and violating the cease and desist order on the other. Thus, the Court finds plaintiffs have produced evidence that the defendants' actions have imposed and threaten to impose a substantial burden on the exercise of their religious beliefs.

### 2. Compelling State Interest/ Least Restrictive Means Test

■ The court must determine whether defendants have shown that there is a compelling state interest for the imposition of the burden and that the burden imposed is the least restrictive means of securing that interest. Defendants argue that they

---

**14.** *See, e.g.,* 146 CONG. REC. S7774–01, *S7776 (Exhibit 1, letter from Coalition for the Free Exercise of Religion) ("Testimony from across the nation has also demonstrated that nonreligious assemblies are often treated far better by zoning authorities than religious assemblies. For example, recreation centers, health clubs, backyard barbecues and banquet halls are frequently the subjects of more favorable treatment than a home Bible study, a church's homeless feeding program or a small gathering of individuals for prayer.")

have a compelling state interest in enforcing the town's zoning regulations and ensuring the safety of residential neighborhoods. The Court agrees that defendants have shown a compelling state interest. There appears to be no dispute that local governments have a compelling interest in protecting the health and safety of their communities through the enforcement of the local zoning regulations. However, "[e]ven where the government has declared a policy of promoting aesthetics and traffic safety ... restrictions intended to accomplish those interests have failed to pass strict scrutiny and have been struck down." *Knoeffler v. Town of Mamakating*, 87 F.Supp.2d 322, 330 (S.D.N.Y.2000), *citing City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

Although the Court finds that defendants have articulated a compelling state interest, the inquiry does not end there. Defendants must next demonstrate that the governmental action taken in "furtherance of [the] compelling interest" is by the "least restrictive means." 42 U.S.C. § 2000cc(a)(1). That is, defendants must show that there are "no other alternative forms of regulation" which would fulfill the state interest. *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963). Defendants have failed to make this showing.

The Court finds no evidence on the record that the issuance of the cease and desist order based on the Commission's opinion was the "least restrictive means" of protecting the health and safety of their community. Defendants' primary concern with plaintiffs' activities was the increased level of traffic on the street, and the safety issues that are inherent in an increased volume of traffic. However, defendants' actions did not address the amount of traffic generated by the participants of the prayer group meetings. Rather, the Commission's opinion speaks entirely in terms of the *number* of *people* allowed to be present in plaintiffs' home on Sunday afternoons. For example, if twenty-five non-family members were in attendance at a particular prayer group meeting and each person drove a separate vehicle, in theory there could be twenty-five cars parked in the cul-de-sac and in plaintiffs' driveway, the same number identified by the Commission as a problem, and in excess of the number of cars observed by the ZEO on three inspections of the activity. On the other hand, fifty participants could conceivably arrive at the prayer meetings in ten or fewer vehicles. To the extent cul-de-sac parking was deemed a problem, the ZEO's decision to bar off-street parking in the Murphy's driveway and rear yard seems inconsistent with the expressed concerns of the neighbors. No justification was voiced at the hearing to support any limitations on off-street parking.

Instead of taking action which would directly regulate the increased volume of traffic on Sunday afternoons, defendants issued an opinion which attempts to control the number of people present in plaintiffs' home. As noted in one land use treatise,

> [p]ublic interference with a man's hobbies, or with his preference to work at home, raises sensitive issues on the nature of freedom, in a quite different way from the familiar situation where a businessman or developer complains that zoning restrictions have abridged his freedom to make more money from land.

TERRY J. TONDRO, CONNECTICUT LAND USE REGULATION 83 (2d ed.1992), *quoting* WILLIAMS, AMERICAN LAND PLANNING LAW § 397.7 (1985 & Supp.1990). Here, defendants are directly intruding into activities within plaintiffs' home when the *reason* given for the interference is activities that

take place outside of plaintiffs' home, that is, the increased traffic levels on the street.

In passing RLUIPA, Congress required local governments to be sensitive to the values of religious freedom and expression. It directed that substantial burdens be placed on the exercise of religion only to the extent necessary to accomplish compelling governmental interests. Even absent a federal statute, one would expect that, before banning an ongoing private religious gathering, public officials in a free and tolerant society would enter into a dialogue with the participants to determine if the legitimate safety concerns of the neighbors could be voluntarily allayed. Particularly where the participants are enjoined by religious teachings to "do unto others" as they would have done unto them,[15] it is not unreasonable to expect the parties to be able to agree on means of reducing the impact of weekly prayer meetings on this small cul-de-sac without undermining the benefit that participants seek to derive from the practice of their faith.

Defendants did not argue that no less restrictive alternatives existed for accomplishing their interest in protecting the safety of the neighborhood. Because of the incongruity between the defendants' actions and the expressed governmental interest, the court cannot find that the issuance of the cease and desist order based on the Commission's opinion interpreting the zoning regulations is the least restrictive means of fulfilling the governmental interest. As defendants have failed to make this showing, for purposes of the preliminary injunction the court can not find that they have a valid defense to the claim they have violated the Act, and, absent some valid argument to the con-

trary, the plaintiffs are therefore likely to prevail on the merits of this claim.

*CONCLUSION*

For the reasons set forth in this ruling, **plaintiffs' Motion for Preliminary Injunction [Doc. # 3], is GRANTED.** Defendants are enjoined from enforcing the outstanding cease and desist order until the resolution of this case or further order of the court.

---

**15.** "In everything do to others as you would have them do to you; for this is the law and the prophets." *Matthew* 7:12; *see also Luke* 6:31.